LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
BENJAMIN A. HERBERT (State Bar No. 277356)
bherbert@millerbarondess.com
ANDREW L. SCHRADER (State Bar No. 307964)
aschrader@millerbarondess.com
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
Telephone: (310) 552-4400
Facsimile: (310) 552-8400

Attorneys for Plaintiff
PRAY, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| PRAY, INC., a Delaware corporation, | **CASE NO.** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) Breach of Contract;** |
| CHRISTIAN CARE MINISTRY, INC., d/b/a MEDI-SHARE, a Delaware corporation; BRANDON HARVATH, an individual; and EVELIO SILVERA, an individual, | **(2) Breach of the Implied Covenant of Good-Faith and Fair Dealing; AND** |
| | **(3) Violation of the Defend Trade Secrets Act** |
| Defendants. | **[DEMAND FOR JURY TRIAL]** |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

1    Plaintiff Pray, Inc. ("Plaintiff" or "Pray"), by and through its undersigned

2    counsel, hereby alleges against Defendants Christian Care Ministry, Inc., d/b/a

3    Medi-Share ("CCM"), Brandon Harvath ("Harvath") and Evelio Silvera ("Silvera")

4    (collectively, "Defendants"), as follows:

5                        **INTRODUCTION**

6        1.    Plaintiff Pray had a revolutionary idea for an affordable, faith-centered

7    approach for mental health treatment called Pray Health.  Defendant CCM agreed to

8    assist Pray to launch the business.  For more than a year, Defendants were

9    enthusiastic proponents of Pray Health.  But when they felt that the contract was not

10   beneficial enough for them, they used Pray's confidential, proprietary trade secrets

11   to develop a copycat mental-health product for themselves and launch the product,

12   cutting Pray out completely.  Defendants violated a core tenant of both Judeo-

13   Christian theology and secular law: "Thou shall not steal."

14       2.    Pray is a software company that uses the power of technology to spread

15   religious faith.  Pray is most notable for its Pray.com product, a consumer app

16   offering tens of thousands of hours of faith-centered audio and video content.  In

17   addition, Pray offers software tools to religious ministries that allow them to

18   understand their audiences and reach new ones.

19       3.    In 2021, Pray began developing a new product for its portfolio.

20   Traditional options for mental-health coverage are expensive and leave many

21   religious consumers wanting.  By uniting providers, consumers and tele-health

22   solutions into a single marketplace, Pray Health would serve as an affordable one-

23   stop-shop for faith-centered mental-health care.

24       4.    Pray identified Defendant CCM as a key potential commercial partner

25   for Pray Health.  CCM operates a healthcare sharing ministry, an alternative to

26   health insurance preferred by some people of faith.  CCM agreed.

27       5.    The companies signed a Strategic Marketing and Support Agreement

28   where CCM would receive in depth access to and provide feedback during Pray's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

1   development of Pray Health in exchange for preferential terms when the product

2   launched.  As part of the agreement, CCM also agreed to maintain the

3   confidentiality of Pray's business information and not use it for any other purpose.

4         6.     With the Strategic Marketing and Support Agreement in place, Pray

5   shared confidential, commercially-valuable proprietary information about Pray

6   Health with CCM.  This included, for example, user interface/user experience

7   ("UI/UX") designs, wire frames showing the visual appearance of portions of the

8   software, product specifications, proprietary marketing analytics and customer

9   insights, proprietary data, content development process materials, the results of

10  costly clinical studies Pray commissioned, design materials, financial research and

11  projections, among other pieces of highly-sensitive confidential commercial

12  information about Pray Health.

13        7.     During this time period, Pray worked closely with two CCM

14  executives, Defendants Harvath and Silvera.  They acted in concert with one another

15  and in the scope of their employment at CCM to receive confidential proprietary

16  information about Pray.

17        8.     Pray believed it had a productive, mutually-beneficial commercial

18  relationship with CCM.  But at a meeting with Harvath, Silvera and other CCM

19  executives in August 2023, Harvath demanded, without any justification, that Pray

20  make him a board member.  When Pray declined, CCM stopped communicating

21  with Pray.

22        9.     In September 2023, Harvath revealed why CCM had done so.  On the

23  stage at an industry conference, he revealed that CCM would soon launch its new

24  mental-health product—without Pray.  Using Pray's confidential proprietary trade

25  secrets, CCM stole Pray's business, then announced the launch of a copycat product

26  to Pray Health.  Pray brings this action to remedy the damage CCM has caused.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**THE PARTIES**

10.    Plaintiff Pray, Inc. is a Delaware corporation that maintains its headquarters and principal place of business in Westlake Village, California.

11.    Defendant Christian Care Ministry, Inc., d/b/a Medi-Share, is a Delaware corporation that maintains its principal place of business in Florida.

12.    Defendant Brandon Harvath is an individual who resides in Florida. Harvath is the Chief Executive Officer of CCM.

13.    Defendant Evelio Silvera is an individual who resides in Florida. Silvera is CCM's Vice President of Communications and Strategy.

**SUBJECT MATTER JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of the violation of a federal law, the Defend Trade Secrets Act, 18 U.S.C. §§ 1831, *et seq*.

15.    This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

16.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District and a substantial part of the property that is the subject of the action—namely Pray's trade secrets—is situated in Westlake Village California, which is located in the Central District of California.

**PERSONAL JURISDICTION**

17.    This Court has personal jurisdiction over Defendants Harvath and Silvera because Harvath and Silvera have purposely availed themselves of the privilege of conducting business activities in California.  This purposeful availment includes developing a business relationship with Pray, whom Harvath and Silvera knew was a California resident.  Harvath and Silvera's contacts include travelling to California and conducting business with Pray in August 2022, September 2022 and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

April 2023.  This case arises out of Harvath and Silvera's contacts with California, and it is fair and reasonable that they answer this suit in California.

18.     This Court has personal jurisdiction over CCM because Harvath and Silvera were acting as employees or agents of CCM, so their contacts are attributed to CCM.  This Court further has personal jurisdiction over CCM because this dispute arises out of the Strategic Marketing and Support Agreement, a contract between Pray and CCM.  In the Strategic Marketing and Support Agreement, CCM consented to personal jurisdiction in the State of California for any dispute arising out of the Agreement.

## FACTUAL ALLEGATIONS

### A.     Pray's Founders Come Together To Create A Digital Platform For Faith

19.     Pray's founders come from diverse backgrounds and walks of life.  But their unique circumstances all led them to pursue a common goal of spreading religious faith through software and technology.

#### 1.     Matt Potter

20.     Pray founder Matthew Potter had his entire life shaped by faith and the Christian church.  In 1986, a girl was pregnant and out of options.  She walked into a church that she had never attended and asked for help.  The pastor of that church made some phone calls and found a couple that had not been successful in having a child and wanted to adopt.  A few months later, that girl gave birth to a baby boy, who the couple adopted and named Matthew Potter.

21.     Potter grew up in the church.  He is also passionate about software and technology.  Beginning when he was still a college student, he started a company which enables real-estate professionals to create smartphone apps for their businesses.  The company's tools powered the creation of more than 8,300 apps.

22.     In 2015, he had a chance meeting with his friend Steve Gatena at a coffee shop in Westlake Village. During their meeting, they discussed a personal

loss Gatena had suffered and how he was relying on faith and prayer to regain his hope. After that meeting, Potter and Gatena decided to found a company that would support faith using the power of software and technology.

### 2. Steve Gatena

23.    Pray founder Steve Gatena has lived a life marked by enormous setbacks followed by incredible recoveries.

24.    Gatena's dream was to serve his country as an officer in the United States Air Force. He secured admission to the United States Air Force Academy. Tragically, Gatena's military career was cut short when he suffered serious injuries in a training accident. Gatena required a ventilator to breathe, and his injuries were so severe that he received an honorable discharge.

25.    With his dreams of military service cut short, Gatena returned to his hometown to begin a long recovery. While many in his situation would sink into despondency, despair and drug or alcohol abuse, Gatena persevered with grit and determination.

26.    After a lengthy convalescence, Gatena recovered not just his health, but also his elite athleticism. He enrolled at the University of California at Davis and joined its football team. Despite working his way from the practice squad to a starting position, Gatena was not satisfied. He created a highlight reel of his plays and shared it on YouTube.

27.    University of Southern California coach Pete Carroll took notice and Gatena transferred to USC. After a season of hard work, Gatena's football career culminated in a victory at the 2009 Rose Bowl. During Gatena's time at USC, he was preparing for the third chapter of his adult life—entrepreneurship. He graduated with a Master's degree and a passion for entrepreneurship.

28.    Within just a few years after graduating from USC, Gatena found success once again. He founded two companies involved in video production and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

became the CEO of a third company, which worked in tv and film production using helicopters, as well as helicopter air ambulance and medical transport.

29.     In 2015, following the unexpected death of his mentor and co-founder, Gatena looked to reorient his professional life and deepen his connection to religious faith. He left the CEO position at the third company, and co-founded Pray.

### 3.     Michael Lynn

30.     For Pray founder Michael Lynn, the church's doors always remained open. Lynn came from humble beginnings, was raised Catholic and attended weekly services growing up. But at college, Lynn interacted with a more secular group and his church attendance declined.

31.     After college, Lynn, alone, moved to Los Angeles. When he first attended church in Los Angeles, he felt reconnected to the values of his youth. He began to look to his church for new friends and community.

32.     Lynn first met Gatena at a panel about entrepreneurship, and they soon became friends. One night, Gatena shared his vision over pizza for what would become Pray. Lynn believed in Gatena's vision and agreed to join him that night, leaving behind a lucrative career in finance, to build Pray.

### 4.     Ryan Beck

33.     Pray founder Ryan Beck found his way to Pray because of the redemptive power of faith. Beck was raised by a single mother. Because of the long hours she worked to support him, she could not provide him with the discipline and moral guidance he needed. Instead, Beck was raised by other teenage boys who lived in similar circumstances. Beck fell into a lifestyle marked by drugs, gangs and poor decision making.

34.     By eighteen, Beck was serving time in jail for selling drugs. Until that time, faith had been a very minor part of Beck's life. That changed when older inmates encouraged him to turn away from the dark path he was on. These men— hardened criminals—tried to give Beck the moral guidance that would allow him to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

live a law-abiding life.  One night, Beck prayed that if he awoke the next morning with a desire to follow Jesus, he would do so.  The next morning, he awoke with conviction and became a Christian.

35.    After his release, Beck developed new connections and role models within his church community.  He saw healthy models of family and community, which had been lacking before.  Beck went on to attend religious colleges, studying theology and computer science.  In 2016, Beck rekindled a friendship with Gatena, who he lost touch with in middle school when he began going down the dark path. When Gatena shared his vision for what would become Pray, Beck joined the company.

**B.    Pray Develops The Digital Destination For Faith**

36.    Pray is a company driven by a mission to grow faith and cultivate community.  Pray's primary product is Pray.com.  Distributed on the web and through smartphone apps, Pray.com offers a wealth of Judeo-Christian audiovisual content, including prayers, Bible readings, meditations, music and podcasts:





MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL. (310) 552-4400  FAX. (310) 552-8400

37.     In addition, Pray offers an enterprise product called PRAYStudio. PRAYStudio is an integrated suite of digital tools that allow ministries to distribute content widely and easily, reach new audiences and analyze the effectiveness of their outreach campaigns.

**C.     Pray Begins Developing Pray Health, A Faith Based Mental Health Platform**

38.     Beginning in 2021, Pray identified an unmet market.  Pray conducts a survey of new customers to identify why they are using the product.  Many people who were using the app stated that they had problems with sleeping, anxiety, depression, or other mental-health-related issues.  Traditional mental-health coverage was expensive, hard to access and misaligned with the values of Judeo-Christian consumers.  Pray believed that, with its cutting-edge technical expertise, it could develop a better solution to mental-health treatment for both religious consumers, employers and healthcare providers.  By the second quarter of 2021, Pray's management was presenting the idea to its board at quarterly meetings.

39.     The product, Pray Health, would be a faith-driven care delivery app that would allow consumers to access a marketplace of health services.  It would connect consumers to an array of mental-health services, including meditation, group coaching, online resources, workshops, community, live chat, 1:1 coaching and on-demand counseling.  Pray Health would also contract with mental-health providers to provide services to Pray Health's faith-centered members.  In addition, Pray Health would contract with insurance companies, other medical payors and employers who wanted to offer mental-health coverage options consistent with Judeo-Christian religious beliefs.

40.     Pray invested considerable resources developing Pray Health.  Pray has invested a tremendous amount of time and resources into research and development of its Pray Health solutions and created many proprietary confidential documents reflecting the research and development process and results.  This included hiring

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

and/or assigning at least a dozen employees or contractors (approximately 20% of Pray's total number of employees) to do significant work on the Pray Health concept. These employees/contractors spent considerable effort developing, as an example, the software underpinnings of Pray Health. Their work is embodied in various forms, including, for example, UI/UX designs; wire frames showing the visual appearance of portions of the software; product specifications; proprietary marketing analytics and customer insights; proprietary data; content development process materials; the results of costly clinical studies Pray commissioned; design materials; and financial research and projections.

41. In addition, Pray invested significant resources into its confidential and proprietary business strategy. For instance, Pray developed proprietary strategies that are critical to the company's success in the marketplace and future plans. This includes, for example, confidential documents regarding Pray's business model; cost and pricing strategy; investments; partnerships; competitive and market research; marketing strategies; product development roadmaps and projections; goals and plans for revenue growth and market power; potential acquisition plans; workforce plans; and sales positioning information. Such proprietary confidential information represents Pray's years of experience and associated investment.

42. Further, Pray invested considerable resources sponsoring clinical trials and scientific studies to determine the effectiveness of some of Pray Health's digital treatment options. Pray retained the services of a leading researcher to conduct rigorous scientific studies into the effectiveness of digitally enabled prayer on mental health. In addition, Pray was asked by the federal Department of Health and Human Services and the National Institutes of Health to consult on issues related to prayer and mental health.

43. Pray relies on its trade secrets, among other things, to protect the intellectual property created by its investment in the ingenuity and industry of its employees.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

D.    **Pray Protects Its Intellectual Property**

44.    To protect its considerable investment in its Pray Health intellectual property, Pray has taken comprehensive measures to protect its intellectual property, including its trade secrets.

45.    As a result of substantial investments and innovation, significant aspects of Pray's health offerings are highly confidential and maintained in strict confidence as trade secrets to protect the substantial investment Pray made to develop them.  This confidential information derives considerable value from not being publicly known outside of Pray, because of the competitive advantage, among other things, that the secret nature of the information confers on Pray from both a technological and business perspective.

46.    Pray uses technical measures to maintain the secrecy of its confidential business information.  Pray maintains its business information using a commercial cloud-services provider with robust security features.  Any access to this information requires authorization and is encrypted to prevent eavesdropping and interception.

47.    Moreover, access to any specific files or information is limited according to the roles and responsibilities appropriate for a given user.  Information stored on Pray's cloud services account is not generally available to all Pray employees.  Rather, individual employees must be expressly and individually granted access to specific files and information necessary for them to carry out their job duties.

48.    In addition, Pray uses contractual agreements to protect the confidentiality of its business information.  Each Pray employee signs multiple agreements requiring them to maintain the confidentiality of Pray's business information, including an Information Restriction Agreement and an Employee Invention Assignment And Confidentiality Agreement.  These agreements require Pray employees to keep company information in strict confidence and trust:

At all times, both during my employment and after its termination, and to the fullest extent permitted by law, I will keep and hold all Proprietary Information in strict confidence and trust.

49.    Pray protects the confidentiality of its trade secrets that are shared with third parties.  Pray's management sometimes determines that it is in Pray's business interest to share confidential business information with prospective investors, customers, or commercial partners.  Prior to sharing any confidential information with a third party, Pray requires strict confidentiality with the third party.  Pray broadly protects its confidential information, including its trade secrets.  Pray further requires that third-party's receiving Pray's confidential information only use that information for the business purpose that led to the information being shared.

50.    When Pray prepares documents containing confidential information, it places a distinctive marking on the bottom of each page, indicating that the information contained within is confidential and should not be distributed:

**PRAY**  Pray.com - Highly confidential - Not for distribution

## E.    Pray Customer CCM Invests In Pray During the Pray Health Development

51.    Beginning in 2022, Pray developed a deep commercial relationship with Defendant CCM.  Within the course of the year, CCM became a customer and then an investor, and received priority access to Pray Health while it was being developed by Pray.

52.    CCM operates a healthcare sharing ministry known as Medi-Share. Healthcare sharing ministries are organizations of people with a common set of beliefs (typically religious) that agree to share medical expenses.  Unlike traditional health insurance, a healthcare sharing ministry does not directly pay for the medical care of its members.  Instead, it coordinates the direct sharing of medical expenses between members.  Healthcare sharing ministries are popular with religious people because they allows them to share resources with and support other people of faith.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

In addition, it allows members to make sure that their healthcare dollars are not funding medical procedures they disagree with.

53.     Pray's management determined that CCM's healthcare sharing business model was a natural fit for its Pray Health concept.  Pray Health would be a low-cost, faith-centered mental-health treatment option for CCM's members.  And CCM would in turn offer a large customer base to kickstart Pray Health.

54.     Pray's management had pre-existing business relationships with CCM's management.  In early 2022, Pray and CCM confidentially discussed mutual business opportunities.  Pray shared confidential information about its business so CCM could evaluate whether it would invest in Pray.

55.     Defendants Harvath and Silvera led the meetings on behalf of CCM.  At that time, Harvath was CCM's Chief Operating Officer and Silvera was its Vice President of Communications & Government Affairs.  Harvath and Silvera expressed great enthusiasm about Pray and especially Pray Health.  Indeed, during an April 2023 in-person meeting in Westlake Village, California, Harvath and Silvera asked for and received Pray-branded jackets:



MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

56.    Pray and CCM's productive early meetings led to CCM making a small investment—$1.5mm—into Pray.  In addition, Pray and CCM executed a contract called the Strategic Marketing and Support Agreement, which is at the core of this dispute.

57.    The Strategic Marketing and Support Agreement governed the commercial relationship between Pray and CCM.  Most pertinent to this dispute, the agreement provided that:

- CCM would refer its customers to Pray's products;

- CCM would support Pray launching the Pray Health product;

- Pray would engage CCM in its development of the Pray Health brand, including providing CCM with priority access to all Pray Health branded products; and

- Both parties would only use confidential information of the other party for the purposes of performing under the Strategic Marketing and Support Agreement.

58.    In addition to the substantive terms, Pray and CCM agreed that the agreement would be governed by and construed in accordance with California law and that any disputes arising under the agreement would be resolved in the state and federal courts located in California.

59.    After the execution of the Strategic Marketing and Support Agreement, Pray shared detailed, confidential and commercially-valuable information about the Pray Health product.  This information included, for example:

- Prototypes of Pray Health;

- Detailed specifications for data structures, UI/UX designs and other product features;

- Confidential marketing information;

- The results of the Pray-sponsored clinical research; and

- Detailed financial research and projections for Pray Health.

60.    Harvath and Silvera were so enthusiastic about Pray Health that they were championing the product both inside CCM as well as outside.  In 2022,

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

Harvath and Silvera were pitching potential investors on a company that would acquire several smaller healthcare sharing ministries and combine them into a larger one. Harvath and Silvera's company was called Benisia. The pitch was that Benisia would feature Pray Health as a key part of the consumer value equation. Benisia's reception with investors was poor, however, as they found the proposed structure of the venture—a thicket of non-profit and for-profit entities—confusing and legally risky.

61. Even after Benisia failed, Harvath and Silvera continued to show enthusiasm for Pray Health. They proposed that Pray's management turn Pray Health into a subsidiary of Pray with Harvath and Silvera serving as its executives. Indeed, in pitch materials, Harvath and Silvera referred to themselves as being part of the Pray Health executive team. Ultimately, Harvath and Silvera refocused exclusively on CCM supporting Pray to launch Pray Health.

62. CCM and Pray deepened their commercial relationship in other ways too. Between June and October 2022, CCM purchased video and audio advertising time on Pray.com. In April 2023, CCM purchased bulk subscriptions to Pray.com, so it could offer the product to its customers. In August 2023, Pray started providing advertising leads for Pray.com customers who would potentially be interested in CCM's healthcare sharing ministry.

**F.**   **CCM CEO Harvath Demands A Board Seat And Cut-Rate Equity In Pray Health**

63. From early 2022 until August 2023, Pray believed it was engaged a fruitful partnership with CCM. CCM was a strong supporter of Pray Health, as well as Pray's other products: CCM appeared to be happy with the parties' relationship as set forth in the Strategic Marketing and Support Agreement.

64. In March 2023, Harvath was promoted and became CCM's CEO. After being appointed CEO, he asked Pray's management to give a presentation

1  about Pray and CCM's dealings to the rest of CCM's management team.  The

2  presentation was scheduled for August 2023.

3    65.    The meeting went forward in August 2023.  After Pray finished its

4  presentation, Harvath ended the meeting by demanding that Pray give Harvath a seat

5  on its board of directors and the right for CCM to purchase equity in Pray at a

6  below-market price.  This had not been discussed prior to the meeting.  Pray's

7  management did not respond to CCM's demand at the meeting.

8    **G.    When Pray Does Not Acquiesce To CCM's Demands, CCM Steals**

9    **The Pray Health Business**

10    66.    As explained above, Defendants had and continue to have a duty to

11  maintain the confidentiality of Pray's trade secrets and confidential

12  informationunder the Strategic Marketing and Support Agreement.  Defendants also

13  collectively had and continue to have an obligation not to disclose or use Pray's

14  trade secret information for purposes beyond the Strategic Marketing and Support

15  Agreement.  But Defendant's stole Pray's Pray Health business, thereby breaching

16  these duties and constituting misappropriation of Pray's trade secrets.

17    67.    Pray's management was surprised by Harvath's demands during the

18  August 2023 meeting.  They came out of the blue.

19    68.    Within a few days of the meeting, Pray responded to CCM's demand.

20  Pray's management explained to CCM that Pray was not in a position to offer

21  Harvath a board seat with Pray unless CCM made a substantial additional

22  investment in Pray, *i.e.*, over $10 million.  When Harvath learned that Pray would

23  not acquiesce to his demand, he was upset.  He said that Pray's founder Gatena was

24  "arrogant" and compared him to the character Gaston from Disney's Beauty and the

25  Beast and said he wanted a follow up meeting.

26    69.    But CCM had no intention of actually discussing the matter further or

27  making an investment in Pray.  Over the next few weeks, CCM rescheduled the

28  meeting with Pray.  The meeting never happened.  Then, CCM stopped

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600  Los Angeles, California 90067
Tel: (310) 552-4400   Fax (310) 552-8400

communicating with Pray altogether.

70.    In September 2023, Pray realized why.  A group called the American Association of Christian Counselors ("AACC") was hosting the Know Hope World Conference at a hotel in Nashville, Tennessee.  AACC hosts the conference yearly, and it is a premier event for Christian counseling.  Representatives from both Pray and CCM attended.

71.    During a keynote address, Harvath announced that CCM was partnering with AACC to create a faith-based mental health and wellness network.  Harvath stated that CCM and AACC were creating "the world's first faith-based mental health and wellness solution."  This was a lie, and Harvath knew it.

72.    CCM knew that Pray Health was already planning to partner with AACC.  To trumpet its new offering, CCM went so far as to even use the same public relationship firm that Pray was using for Pray Health.

73.    CCM was stealing Pray Health and repackaging it as CCM's own.  At the conference, Harvath also stated that "no one else is doing this work right now."  Another lie.  Defendants knew that statement was false.  They knew Pray had been working on just such a product, Pray Health, since at least early 2022.

74.    CCM, moreover, concealed its wrongful conduct.  Several months prior to CCM revealing its collaboration with AACC, Pray's management told Silvera that Pray would be interested in working with AACC as part of Pray Health.  Silvera discouraged Pray from reaching out to AACC, said that AACC's President Tim Clinton was unethical and forwarded a link to a news story about a lawsuit accusing Clinton of fraud.

75.    Only a few months later, however, CCM revealed its own collaboration with AACC.  In retrospect, it is obvious what Silvera was doing.  He didn't want anyone from Pray speaking with AACC because Pray would likely learn what CCM was doing and its ongoing theft.

76.    CCM's mental-health network is slated to be available in Spring 2024.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

77.     As trusted partners under the Strategic Marketing and Support Agreement, Defendants had front row seats to Pray's confidential and proprietary business strategies and had extensive access to Pray's confidential and proprietary information related to Pray Health.  By developing a competing product to Pray Health, CCM breached its contractual obligations in the Strategic Marketing and Supporting Agreement and misappropriated Pray's trade secrets.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against Defendant CCM)

78.     Pray incorporates and re-alleges every allegation above as if fully set forth herein.

79.     The Strategic Marketing and Support Agreement was a valid and enforceable contract, with consideration, that Pray and CCM voluntarily entered into.

80.     Pray performed as promised in the Strategic Marketing and Support Agreement, and to the utmost extent possible, fulfilled each and every term of this contract, except as to any terms that it was prevented or excused from performing.

81.     CCM materially breached the contract by (1) developing a competing mental-health product rather than supporting Pray's Pray Health product as agreed in the contract; and (2) using confidential information that Pray provided to CCM to develop its competing mental-health product.

82.     As a proximate result of CCM's conduct, Pray has suffered damages in an amount subject to proof at trial, but no less than $250 million.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good-Faith and Fair Dealing

### (Against Defendant CCM)

83.     Pray incorporates and re-alleges every allegation above as if fully set forth herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

84. The Strategic Marketing and Support Agreement was a valid and enforceable contract that existed between Pray and CCM.

85. Pray performed as promised in the Strategic Marketing and Support Agreement, and to the utmost extent possible, fulfilled each and every term of this contract, except as to any terms that it was prevented or excused from performing.

86. Pray bargained for and received a promise from CCM for CCM to support Pray in launching Pray Health. This was one of the benefits for Pray of the contract.

87. To the extent that CCM's actions in developing a product competitive to Pray Health did not violate an explicit term in the Strategic Marketing and Support Agreement, Pray alleges, in the alternative, that CCM prevented Pray for receiving that benefit of the Strategic Marketing and Support Agreement by developing a product that would directly compete with Pray Health.

88. By doing so, CCM did not act fairly or in good faith.

89. As a proximate result of CCM's conduct, Pray has suffered damages in an amount subject to proof at trial, but no less than $250 million.

## THIRD CAUSE OF ACTION

### Violation of the Defend Trade Secrets Act (DTSA)

### (18 U.S.C. §§ 1836(b), 1839 *et seq.*)

### (Against All Defendants)

90. Pray incorporates and re-alleges every allegation above as if fully set forth herein.

91. Pray is the owner of certain confidential, valuable trade secrets relating to Pray Health, as previously discussed. These trade secrets, which are not publicly disclosed, relate to Pray's products and services that are used in or intended for use in interstate and foreign commerce. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage to

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

Pray, and Pray has spent a significant amount of time and money developing such confidential information and trade secrets.

92.     At all times, Pray has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality agreements to be signed by Pray's employees and any other party granted access to Pray's trade secrets, as well as using technological means to maintain the secrecy of Pray's trade secrets.

93.     In the course of Pray's commercial relationship with CCM, Pray afforded Defendants limited access to and limited use of Pray's confidential information and trade secrets, which Defendants had a duty to maintain as confidential.  Defendants further executed the Strategic Marketing and Support Agreement, where they expressly acknowledged and confirmed the confidential nature of these secrets.  Defendants were not to use Pray's confidential information for any purpose other than to further the purposes of the Strategic Marketing and Support Agreement.

94.     As stated above, Pray sells its solutions throughout the United States. The confidential information and trade secrets to which Defendants had access are related to Pray's products and services that are used in, or intended for use in, interstate or foreign commerce.

95.     Harvath, Silvera and other employees of CCM misappropriated Pray's confidential information and trade secrets to benefit themselves and CCM, and to allow CCM to unfairly compete against Pray by using Pray's trade secrets, including in this District.  Misappropriation of this type of information undermines Pray's competitive position in the highly competitive technology solutions and healthcare industries.

96.     Defendants knew or should have known that Pray's trade secrets (a) are confidential; (b) were disclosed or used without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

of the trade secret was—(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to Pray to maintain the secrecy of the trade secret or limit the use of the trade secret; (c) were developed or acquired by Pray at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Prays' competitors; (e) would provide significant benefit to a competitor seeking to compete with Pray; and (f) are critical to Pray's ability to conduct its business successfully.

97. Defendants improperly used and disclosed Pray's trade secrets when instead of using Pray's confidential information solely for the purposes of helping Pray launch the Pray Health product, they used that information to develop a product that would compete with Pray Health. Defendants have benefited and will continue to benefit from their use of Pray's trade secrets as they develop their product, which competes with Pray Health.

98. Harvath, Silvera and other CCM employees who misappropriated Pray's trade secrets are agents of CCM, and their misappropriation of Pray's trade secrets occurred, and is occurring, during the course of and within the scope of their employment at CCM. Their improper actions, including transferring Pray's confidential and trade secret information to AACC and using such information to create a product to compete with Pray Health, were substantially within the temporal and spatial scope of their employment with CCM and were for the purpose of giving CCM an unfair advantage against Pray.

99. CCM is therefore at least vicariously liable for Harvath, Silvera and other CCM employees' misappropriation of Pray's trade secrets, in addition to being directly liable for its own improper use and disclosure of Pray's trade secrets as alleged herein.

100.   At no time has Pray consented to the Defendants' improper acquisition, disclosure, or use of Pray's trade secrets for any reason unrelated to the purposes of the Strategic Marketing and Support Agreement.

101.   As a direct and proximate result of Defendants' current and continued misappropriation of Pray's trade secrets, Pray has been damaged, including but not limited to the loss of goodwill and profits.

102.   Defendants have engaged in the actual and threatened misappropriation of Pray's confidential information, including trade secrets, in violation of the DTSA.

103.   The actions of the Defendants were and continue to be intentional, willful, outrageous and malicious, justifying actual and exemplary damages to the extent permitted under the law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment, as follows:

1.     Compensatory, general and special damages, including Pray's lost revenues and profits, and any unjust enrichment, restitution, or disgorgement, in excess of $250 million, according to proof at trial;

2.     Punitive damages in an amount to be determined at trial;

3.     Attorneys' fees and costs;

4.     Pre- and post- judgment interest as permitted by law; and

5.     Such other and further relief as the Court deems just and proper.

DATED:  December 20, 2023          MILLER BARONDESS, LLP



By:      /s/ Louis R. Miller
         LOUIS R. MILLER
         Attorneys for Plaintiff
         PRAY, INC.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

1    **<u>DEMAND FOR JURY TRIAL</u>**

2    Plaintiff hereby demands a trial by jury on all claims so triable.

3

4    DATED:  December 20, 2023          MILLER BARONDESS, LLP

5

6

7                                        By:    ___/s/ Louis R. Miller_____

8                                               LOUIS R. MILLER
                                                Attorneys for Plaintiff
9                                               PRAY, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

COMPLAINT