1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  JUSTIN EHRLICH (State Bar No. 217606)
   jehrlich@millerbarondess.com
3  BENJAMIN A. HERBERT (State Bar No. 277356)
   bherbert@millerbarondess.com
4  DOMINIC NUNNERI (State Bar No. 300465)
   dnunneri@millerbarondess.com
5  MILLER BARONDESS, LLP
6  2121 Avenue of the Stars, Suite 2600
   Los Angeles, California 90067
7  Telephone: (310) 552-4400
   Facsimile: (310) 552-8400
8

9  Attorneys for Plaintiff
10 PRAY, INC.

11          **UNITED STATES DISTRICT COURT**

12   **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13

| | |
|---|---|
| 14  PRAY, INC., a Delaware corporation, | **CASE NO. 2:23-cv-10660** |
| 15              Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| 16       v. | **(1) Breach of Contract;** |
| 17  CHRISTIAN CARE MINISTRY, INC., | **(2) Breach of the Implied Covenant of Good-Faith and Fair Dealing;** |
| 18  d/b/a MEDI-SHARE, a Delaware corporation; BRANDON HARVATH, | |
| 19  an individual; and EVELIO SILVERA, an individual, | **(3) Violation of the Defend Trade Secrets Act;** |
| 20 | |
| 21              Defendants. | **(4) Concealment;** |
| 22 | **(5) Intentional Misrepresentation.** |
| 23 | **[DEMAND FOR JURY TRIAL]** |

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION .................................................................1

THE PARTIES ...................................................................................5

SUBJECT MATTER JURISDICTION AND VENUE ...................................5

PERSONAL JURISDICTION ................................................................6

FACTUAL ALLEGATIONS ..................................................................8

A.  Pray is Well Known in the Niche Christian Market as Being an Expert in Software Development, Mobile/Online Program Development, and Video/Content Production.....................8

  1.  Ryan Beck.....................................................9

  2.  Matthew Potter..............................................9

  3.  Steve Gatena.................................................10

  4.  Michael Lynn.................................................10

B.  Because of Its Expertise, Pray Developed the World's Leading Faith-Based Platform for Christians.....................10

C.  Pray Came Up With a New Product, Called Pray Health...........12

D.  Pray Developed Confidential Information and Trade Secrets for Pray Health...............................................13

  1.  Marketing Strategy Based on Customer Data Analytics..13

  2.  Peer-Reviewed Studies.........................................14

  3.  Pray Health Product's Structure and Design..............15

  4.  Unique Content Created for Pray Health...................16

E.  Pray Protects All Its Confidential Information and Trade Secrets, Including Those Related to Pray Health.................16

F.  CCM is Not a Tech Company Like Pray.........................17

G.  CCM Told Pray that CCM Would Never Be Able to Build a Product Like Pray Health on Its Own Because of CCM's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

i

Lack of Technical Expertise……………………………………..18

H.    CCM, Harvath and Silvera Used Pray's Trade Secrets to Decide Whether to Build Its Own Product………………………19

I.    Pray and CCM Entered Into the Strategic Marketing and Support Agreement, dated May6, 2022…………………………20

J.    CCM Instilled Trust by Investing $1.5 Million in Pray.com…….23

K.    The Initial One-Year Term of the SMSA was Extended by Pray and CCM's Multiple "Definitive Agreements."…………………23

    1.    Definitive Agreement No. 1—The Master Subscription Agreement…………………………………………………...24

    2.    Definitive Agreement Nos. 2, 3, 4—Insertion Orders……24

    3.    Definitive Agreement Nos. 5, 6, and 7—Master Services Agreement, Statement of Work and Purchase Order……..25

    4.    The Parties' Oral Agreements and Course of Conduct Confirmed Extension of the SMSA's Initial Term……….26

L.    Pray Transferred Confidential Information and Trade Secrets Regarding Pray Health to CCM, Harvath and Silvera…………..26

M.    CCM CEO Harvath Demands a Board Seat and Cut-Rate Equity an Pray Health…………………………………………30

N.    Once CCM, Harvath and Silvera Had Obtained Enough Pray Health Confidential Information and Trade Secrets, They Stopped Communicating with Pray………………………………31

O.    CCM, Harvath and Silvera Used Pray's Trade Secrets, and Announced Their Stolen Product to Thousands of People at an Industry Conference……………………………………..32

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

FIRST CAUSE OF ACTION .................................................….. 38

SECOND CAUSE OF ACTION ................................................41

THIRD CAUSE OF ACTION ..................................................42

FOURTH CAUSE OF ACTION ...............................................45

FIFTH CAUSE OF ACTION ...................................................47

PRAYER FOR RELIEF .........................................................50

DEMAND FOR JURY TRIAL .................................................51

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Plaintiff Pray, Inc. ("Plaintiff" or "Pray"), by and through its undersigned counsel, hereby pleads against Defendants Christian Care Ministry, Inc., d/b/a Medi-Share ("CCM"), Brandon Harvath ("Harvath"), and Evelio Silvera ("Silvera") (collectively, "Defendants"), the allegations and causes of action below in this First Amended Complaint.  Per the Court's Order (Dkt. 63), Plaintiff enclosed as Exhibit A hereto, a Notice of Revisions which contains a redlined comparison of this First Amended Complaint to the original complaint.

## NATURE OF THE ACTION

1.      Pray brings this case against CCM, and CCM's former CEO (Harvath) and former VP of Communications (Silvera), due to their theft of Pray's confidential information and trade secrets related to Pray Health.  Pray Health is a first-of-its-kind faith-based mental health solution provided over a digital interface platform.  Pray Health was confidentially developed by Pray, using years of Pray's proprietary information and research.  Nothing like Pray Health existed until Pray developed it.

2.      Pray Health caters to a niche group of customers—Christians looking for an alternative to mainstream mental health treatment.  Pray Health is only possible because of Pray's confidential information and trade secrets, which are protected by Pray via confidentiality agreements and internal security measures.

3.      Pray and CCM first met in 2021.  Pray is a tech company, specializing in software development, mobile/online program development, and video/content production.  CCM is not.  Instead, CCM facilitates a cost-sharing ministry in which paying members share health care costs.

4.      Pray and CCM first spoke to explore mutually beneficial arrangements.  Before sharing anything confidential, Pray required that CCM sign a broad confidentiality agreement.  Only then did Pray share details about its entire platform, Pray.com.  As part of this exchange, Pray shared its Pray Health product with CCM.

5.      CCM was amazed by Pray Health, expressing tremendous excitement for the new product.  CCM, through Harvath, Silvera, and others, told Pray that

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

CCM did not have the technical ability to come up with or execute an idea like Pray Health on its own.

6.     As Pray and CCM continued sharing information about their businesses, CCM, led by Harvath and Silvera, focused on Pray Health.  CCM, Harvath and Silvera sought more and more details about the product.

7.     To instill trust, CCM made a $1.5 million investment into the entire Pray.com platform.  CCM, Harvath and Silvera did this to induce Pray to continue sharing confidential information and trade secrets about Pray Health.

8.     It worked.  Over time, CCM, Harvath and Silvera gained access to more and more confidential information and trade secrets related to Pray Health, as described in detail below at Paragraphs 66-82.

9.     After seeing all of this, CCM, Harvath, and Silvera told Pray that their exposure to Pray Health confidential information and trade secrets made CCM, Harvath and Silvera believe a product like Pray Health was commercially viable. Only then did CCM, Harvath and Silvera believe it was worthwhile to support a product like Pray Health.

10.     As a result, Pray and CCM entered into a Strategic Marketing and Support Agreement, dated May 6, 2022 ("SMSA"), that required CCM to support Pray in building out the Pray Health brand, which consisted of the Pray Health product.  (SMSA ¶ 1(c).) As part of the SMSA, CCM also agreed to maintain the confidentiality of Pray's business information.  (SMSA ¶ 4.)

11.     The SMSA had an initial one-year term, which was extended by Pray and CCM verbally and in writing, via seven "Definitive Agreements" as that term is defined in the SMSA.  (SMSA ¶ 2.)  While the SMSA was in effect, CCM, Harvath and Silvera knowingly, deliberately, and repeatedly reached into California to obtain more and more confidential information and trade secrets about Pray Health.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

12.    Specifically, CCM, Harvath and Silvera engaged in four in-person meetings in California, as well as 31 Zoom calls, six Google Meet-Up meetings, and one Microsoft Teams meeting, all directed to Pray personnel in California.

13.    During these interactions, Pray continued sharing more and more detail and specifics about its Pray Health confidential information and trade secrets. Specifically, Pray shared in-depth information and documents illustrating the Pray Health marketing strategy based on Pray's unique customer data analytics; peer-reviewed studies related to Pray Health; Pray Health's structure and design (which is highly technical and driven by years of Pray's data and A/B testing of customer behavior); and user-content created specifically for Pray Health.

14.    CCM, Harvath and Silvera continued initiating contact with Pray in order to further instill confidence and trust, and to maintain open access to Pray's confidential information and trade secrets about Pray Health.  This was done to induce Pray to share more and more openly with CCM, Harvath and Silvera.

15.    During this same time period, CCM, Harvath and Silvera got the idea to take Pray's confidential information and trade secrets and launch the product on their own, without Pray, and without telling Pray about their plans.

16.    To carry this out, CCM, Harvath and Silvera secretly spoke to the American Association of Christian Counselors ("AACC") to develop a competing product behind Pray's back.  CCM, Harvath and Silvera did not tell AACC its plan was based on theft, because Pray had an existing relationship with AACC.

17.    Meanwhile, Silvera actively discouraged Pray from speaking directly with AACC a few months before CCM, Harvath and Silvera completed the theft. Silvera specifically told Pray not to contact AACC, saying that its leader, Tim Clinton, was corrupt and should be avoided.  By doing this, Silvera actively concealed what CCM, Harvath and Silvera were doing behind Pray's back.

18.    Up to this point, Pray believed it had a productive, mutually-beneficial commercial relationship with CCM.  But that changed in August 2023 at a meeting

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  with Harvath, Silvera and other CCM executives.  During this meeting, Harvath

2  demanded, without any justification, that Pray make him a board member of Pray.

3  When Pray declined, CCM stopped communicating with Pray.

4       19.    This was strange, considering the affirmative statements of support,

5  trust, and teamwork that CCM, Harvath and Silvera had communicated to Pray for

6  over a year and a half between early 2022 and August 2023.  It turns out these

7  affirmative statements were misrepresentations of the truth.

8       20.    At this point, CCM, Harvath and Silvera felt like they had obtained

9  enough confidential information and trade secrets about Pray Health.  So when Pray

10 denied Harvath a board seat, CCM, Harvath and Silvera carried out their plan to

11 abscond with the Pray Health trade secrets and launch a copy-cat product.

12      21.    CCM, Harvath and Silvera were violating a core tenant of Christian

13 theology and secular law: "Thou shall not steal."

14      22.    The truth came out in September 2023, at AACC's industry conference

15 in Nashville.  At the conference, Pray-co-founder Matthew Potter spoke to AACC's

16 CEO, Ben Allison, about Pray Health.  Allison looked surprised, and suggested that

17 Potter speak to Harvath and Silvera, who he said were already working on a mental

18 health solution on behalf of CCM.  Allison then showed Potter a demo of CCM's

19 product.

20      23.    Potter realized right away that CCM, Harvath and Silvera had stolen

21 Pray's trade secrets related to Pray Health.  The product was clearly influenced by

22 Pray Health trade secrets, and there was no way CCM could have developed the

23 demo on its own without using the Pray Health trade secrets.  This was especially

24 true given that CCM had expressed on multiple occasions prior to the demo's

25 revelation that CCM (1) did not have the technical expertise to create the sort of

26 customer interface at issue; (2) had not understood the commercial viability of a

27 faith-based mental health tool based on prayer prior to reviewing Pray's trade

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1  secrets; and (3) only decided to support Pray Health after seeing (and because of)

2  the confidential information and trade secrets described in Paragraphs 66-82, below.

3      24.    Later that day, on the stage at the conference, Harvath announced that

4  CCM would soon launch its new mental-health solution—without Pray. Never

5  before had CCM, Harvath or Silvera told Pray they were developing their own

6  product, nor had they indicated they'd do it without Pray. Using Pray's confidential

7  proprietary trade secrets, CCM stole Pray's business. Pray brings this action to

8  remedy the damage caused by CCM, Harvath and Silvera.

9  **THE PARTIES**

10      25.    Plaintiff Pray, Inc. is a Delaware corporation with its headquarters and

11  principal place of business in Westlake Village, California.

12      26.    Defendant Christian Care Ministry, Inc., d/b/a Medi-Share is a

13  Delaware corporation with its principal place of business in Florida.

14      27.    Defendant Brandon Harvath is an individual who resides in Florida.

15  During the relevant time periods underlying this First Amended Complaint, Harvath

16  was first the Chief Operating Officer of CCM, and then was promoted to Chief

17  Executive Officer of CCM.

18      28.    Defendant Evelio Silvera is an individual who resides in Florida.

19  During the relevant time periods underlying this First Amended Complaint, Silvera

20  was CCM's Vice President of Communications and Strategy.

21  **SUBJECT MATTER JURISDICTION AND VENUE**

22      29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.

23  §§ 1331 and 1337 because this action arises out of the violation of a federal law, the

24  Defend Trade Secrets Act, 18 U.S.C. §§ 1831, *et seq*.

25      30.    This Court also has supplemental jurisdiction over the asserted state

26  law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims

27  derive from a common nucleus of operative facts.

28      31.    Venue is proper in the Central District of California pursuant to 28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District and a substantial part of the property that is the subject of the action—namely Pray's confidential information and trade secrets—is situated in Westlake Village, California, which is located in the Central District of California.

### PERSONAL JURISDICTION

32.     This Court has personal jurisdiction over CCM, Harvath and Silvera because they have all purposely directed their actions regarding Pray Health to California.

33.     From early 2022 to August 2023, Defendants directed their engagement with a California-based company, Pray, via *at least* four in-person meetings in California, 31 Zoom meetings, six Google Meet-Up meetings, and one Microsoft Teams meeting, all while the Pray participants were in California.  CCM, Harvath and Silvera were aware that the Pray participants would be in California during these meetings.  On behalf of CCM, Harvath and Silvera also sent numerous e-mails to Pray personnel in California during this same time period.  With respect to each Defendant, attendance at the California meetings was as follows:

34.     <u>In-Person Meetings in California</u> – Harvath and Silvera met with Pray in California in August 2022, September 2022, and April 2023.  In addition, Silvera met for dinner with Matthew Potter from Pray in June 2022 in California.

35.     <u>Zoom Meetings Directed at California</u> – Of the 31 Zoom meetings directed at California, Silvera attended 28 of them, Harvath attended 14 of them, and other CCM personnel[1] attended 12 of them.  Under California law, Zoom meetings with participants in a forum can establish personal jurisdiction.  Courts have found personal jurisdiction when there was only one in-person meeting, and far fewer than

---

[1] These CCM personnel include M. Joos, K. Koss, J. Rosoff, W. Lindsey, D. Carroll, S. Keene, A. Padilla, R. Barrack, S. Ferguson, and M. James.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    31 Zoom meetings in a forum.  *Rewardify, Inc. v. Synvest Canco, Inc.*, 2022 WL

2    718492, at *5 (S.D. Cal. Mar. 10, 2022) (finding defendants had sufficient contacts

3    to establish personal jurisdiction in California when the defendants had

4    approximately ten Zoom meetings and one in-person meeting in California, with a

5    California-based plaintiff, for the purposes of negotiating a contract).

6        36.    <u>Google Meet-Up Meetings Directed at California</u> – Of the six Google

7    Meet-Up meetings, Silvera attended six of them and Harvath attended four of them.

8        37.    <u>Microsoft Teams Meetings Directed at California</u> – The one Microsoft

9    Teams meeting, both Silvera and Harvath attended.

10       38.    CCM, Harvath and Silvera's intent behind all these contacts with

11   California was to reach into this forum to obtain from Pray confidential information

12   and trade secrets regarding Pray Health.  Additionally, all confidential information

13   and trade secrets regarding Pray Health were developed in California.  CCM,

14   Harvath and Silvera were aware of this.

15       39.    Defendants succeeded.  CCM, Harvath and Silvera obtained the Pray

16   Health confidential information and trade secrets they actively sought during the in-

17   person, Zoom, Google Meet-Up, and Microsoft Teams meetings.

18       40.    By way of example, during the in-person meeting on April 27, 2023,

19   which both Silvera and Harvath attended in California, Pray personnel walked

20   through Pray Health PowerPoint presentations marked "Highly Confidential."

21   These PowerPoint presentations contained confidential information and trade secrets

22   regarding Pray Health, such as the marketing strategy for Pray Health based on

23   Pray's customer data analytics; information informed by peer-reviewed studies

24   related to Pray Health, including non-public confidential aspects of the studies; Pray

25   Health's structure and design; and content for users created for Pray Health.  The

26   discussions surrounding these materials covered these same topics.

27       41.    This is just one example of CCM, Harvath and Silvera's purposeful

28   direction at Pray in California, intended to extract confidential information and trade

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

secrets and take them out of California.  There are many more discussed in detail below at Paragraphs 129-144.

42.    Further, CCM, Harvath and Silvera induced Pray to share confidential information and trade secrets on false pretenses.  Specifically, they postured as if CCM were a good-faith partner.  In reality, CCM, Harvath and Silvera were intentionally concealing the fact that they were (at some point when the applicable agreements were in force) secretly working with AACC to develop and launch their own copy-cat faith-based mental health solution without Pray.  CCM, Harvath and Silvera's acquisition of the Pray Health trade secrets from Pray after this point in time was improper because, when they acquired the trade secrets, they intended to use them in violation of the SMSA to develop and launch their own faith-based mental health solution with AACC, and without Pray.  Silvera even told California-based Pray that it should not speak to AACC because its leader, Tim Clinton, was corrupt.  Silvera was actively concealing CCM's secret plan.

43.    This Court also has personal jurisdiction over CCM because this dispute arises out of the SMSA, a contract between Pray and CCM.  In the SMSA, CCM consented to personal jurisdiction in the State of California for any dispute arising out of the SMSA.  All of Pray's causes of action arise out of the SMSA.

## FACTUAL ALLEGATIONS

**A.    Pray is Well Known in the Niche Christian Market as Being an Expert in Software Development, Mobile/Online Program Development, and Video/Content Production.**

44.    Pray was formed in 2016 by Ryan Beck, Matthew Potter, Steven Gatena, and Michael Lynn.  Pray's founders are experts in software development, mobile/online program development, as well as video, audio, and print production.

45.    Since Pray's founding in 2016, the skills and expertise of its founders have grown rapidly.  Pray has also focused its hiring efforts on employees who have technical backgrounds and expertise similar to its founders, namely software

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

development, mobile/online program development, as well as video, audio, and print production.  Thus, Pray has become a well-known leader in the Christian marketplace as an expert in these areas.

46.     Pray's founders are all active members of the Christian faith and have a passion for bringing their technical expertise to the niche Christian marketplace.

### 1.     Ryan Beck

47.     Ryan Beck ("Beck") is a software developer and software engineer. Before Pray, he worked as a developer creating business software to manage thousands of projects and donors across multiple continents, enabling hundreds of employees to more effectively help children, mothers and others in India and the greater Asia area become teachers, business owners and faith leaders.

48.     Beck's faith led him to co-found Pray.  As a teenager, Beck served jail time for selling drugs, but later turned his life around.  To do so, Beck relied on the redemptive power of his Christian faith.  As he grew older, Beck decided to put his technical expertise to use helping others with their faith by working at Pray.

### 2.     Matthew Potter

49.     Before Pray, Matthew Potter ("Potter") founded a tech company called HomeStack.  HomeStack is a smartphone platform that allows real estate brokers and agents to create their own profiles and market their real estate listings.  Over 8,300 profiles have been created by real estate brokers and agents using HomeStack. Potter still runs HomeStack to this day.

50.     Potter's faith also led him to co-found Pray.  With the help of a Christian church, Potter was adopted as a baby.  As a result, his faith has always been extremely important to him, as well as his efforts to give back to others.  Pray became the perfect way for Potter to apply his skills to helping others.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

### 3. Steve Gatena

51.     Steve Gatena ("Gatena") is an expert in video production and content creation.  Before Pray, Gatena founded two companies that specialized in video production, and became the CEO of a third, which did the same work.

52.     In 2015, following the unexpected death of his mentor, Gatena looked to reorient his professional life and deepen his connection to religious faith.  He left the CEO position he had at the time, and co-founded Pray.

### 4. Michael Lynn

53.     Michael Lynn ("Lynn") is an expert in financial services.  Lynn has an MBA from USC Marshall School of Business, where he graduated on the Dean's List.  Before Pray, Lynn worked as a Private Wealth Advisor at Merrill Lynch. While there, Lynn attained the Certified Private Wealth Advisor designation, an advanced credential for wealth managers.

54.     Lynn first met Gatena at a panel about entrepreneurship, and they soon became friends.  One night, Gatena shared his vision for what would become Pray. Lynn believed in Gatena's vision and agreed to join him, leaving behind a lucrative career in finance to co-found Pray.

### B.     **Because of Its Expertise, Pray Developed the World's Leading Faith-Based Platform for Christians.**

55.     Pray's primary product is Pray.com.  Distributed on the web and through smartphone apps, Pray.com offers a wealth of Christian audiovisual content, including prayers, Bible readings, meditations, music, and podcasts.

56.     Pray.com is the world's number one app for daily prayer and faith-based media content, reaching more than 16 million people around the world.

57.     In addition, Pray offers an enterprise product called PRAYStudio, which is an integrated suite of digital tools that allows ministries to distribute content widely and easily, reach new audiences and analyze the effectiveness of their outreach campaigns.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

FIRST AMENDED COMPLAINT

58.     Pray's products have been extremely successful and their use is widespread.  Pray and its founders have received numerous accolades:

(a)     In 2020, Pray.com became the highest-grossing religion-based smartphone app in history.

(b)     In 2019, Pray's co-founder, Gatena, was honored with C-Suite Quarterly's "40 under 40" Visionary Award.

(c)     In 2020, Pray was named one of LA Business Journal's Best Workplaces.

(d)     In 2021, Gatena was named one of the top 25 Consumer Health Tech Executives by the Healthcare Technology Report after working with the U.S. Surgeon General, Dr. Vivek Murthy.

(e)     In 2022, Pray.com was awarded "Best in Business" by Inc. Magazine.

(f)     In 2022, Pray.com was listed as an honorable mention in Fast Company's list of World Changing Ideas.

(g)     In 2023, Pray.com became Inc. 5000's fastest growing faith-based media company in the United States.

(h)     Pray was the first for-profit company to lead the National Day of Prayer with the President of the United States.

(i)     Pray was the only app to help the Vatican raise money to support refugees from war-torn countries.

(j)     Because of Pray's widespread success, Gatena was appointed by the President of the United States as a non-partisan advisor to the White House on economic and cybersecurity matters.  Gatena has served under multiple presidential administrations.

(k)     Pray was asked by the federal Department of Health and Human Services and the National Institutes of Health to consult on issues

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

11

1 related to prayer and health.

2 **C.** **Pray Came Up With a New Product, Called Pray Health.**

3 59. Pray began working on Pray Health in 2021. Pray Health was intended

4 to satisfy an unmet market for mental health treatment via faith-based solutions

5 delivered through a digital interface. This is new. No one had ever done it before.

6 60. The idea for Pray Health came from a survey Pray conducted of its

7 Pray.com customers to identify why they were using Pray's existing products.

8 Many cited mental health issues, such as anxiety, worry, panic, depression and poor

9 sleep. Traditional mental-health coverage is expensive, hard to access and

10 sometimes not aligned with the values of the niche Christian market.

11 61. After the survey, Pray believed it could develop a unique faith-based

12 solution. The product would be called Pray Health. Pray knew it was best

13 positioned to do this work because it had years of data analytics on the niche

14 Christian market and also had developed cutting-edge technical expertise.

15 62. Pray Health was designed to be a faith-driven solution that would allow

16 consumers to access a marketplace of mental health services. Pray Health would

17 connect consumers to an array of mental-health services. It would also contract with

18 mental-health providers to provide services to Pray Health's faith-centered

19 members, as well as insurance companies, other medical payors, and employers who

20 wanted to offer mental-health coverage options consistent with Christian beliefs.

21 63. Pray developed Pray Health from scratch. This took substantial time

22 and money. Pray devoted about 20% of its workforce to Pray Health, to perform the

23 following tasks: develop software; develop the product's structure and design;

24 develop content for users; develop marketing strategies and PowerPoint

25 presentations; prepare sample product mock-ups; and prepare financial statements,

26 budgets, financial projections and business strategies. All of this work was specific

27 to Pray Health.

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

64.    To develop Pray Health, Pray relied on the data it had collected for years from the pool of its own 16 million existing customers.  This data applies to the niche Christian market as a whole, even those who were not Pray's customers.

65.    Pray Health is different than all other existing mental health treatment solutions, because it is targeted at the niche Christian marketplace and is also offered through a first-of-its kind digital interface.  Mental health solutions and treatment had never been tailored to the niche Christian marketplace before.  No one had ever created a faith-based mental health solution using Pray Health's unique digital interface.

**D.    Pray Developed Confidential Information and Trade Secrets for Pray Health.**

66.    Pray developed commercially valuable confidential information and trade secrets for Pray Health.  These trade secrets cost Pray tens of millions of dollars to develop.  They are as follows:

**1.    Marketing Strategy Based on Customer Data Analytics.**

67.    The Pray Health marketing strategy was guided by data collected on Pray's unique customer base.  Over several years, Pray spent millions of dollars collecting data on, and cultivating, its own unique customer base.

68.    By way of example, Pray knew what marketing strategies would attract, retain, and appeal to its customers, including the time of day to market, response rates to different marketing media, to whom to market, what marketing strategies work on specific geographic regions and racial groups, what color schemes in the advertisements cause its customers to click an advertisement, and ultimately what strategies are effective in getting customers to engage with and purchase a faith-based product.  This data is specific to the niche Christian market.

69.    Further, the pool of customers was specifically seeking an alternative faith-based mental health solution via a digital interface.  Pray knew this from its survey, which sparked the idea of Pray Health in the first place.  All of this

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

1  confidential data informed whether Pray Health was a viable business.  Once Pray

2  knew it was, this data also informed *how* Pray would market Pray Health.

3      70.    Further, Pray's marketing strategy based on customer data analytics

4  informed specific confidential, proprietary components of the Pray Health product,

5  including its user interface and user experience designs, wire frames showing the

6  visual appearance of portions of the software, product specifications, content

7  development process materials, design materials, and financial research/projections.

8              **2.    Peer-Reviewed Studies.**

9      71.    In the early stages of developing Pray Health, Pray commissioned peer-

10  reviewed academic studies from leading subject matter experts.  Pray knew its

11  customers desired a faith-based solution to mental health challenges, but wanted to

12  make sure it would work via a digital interface.  This had never been done before.

13  This is why Pray pursued peer-reviewed studies.  It is also why professors from top-

14  notch universities agreed to conduct these studies and were interested in the Pray

15  Health product.

16      72.    For example, Todd Hall, a faculty member at Harvard University and

17  Biola University, worked on these studies.  Pray worked with Mr. Hall through his

18  affiliation at Harvard's Human Flourishing Program.  Pray also worked with UC

19  Berkeley's Haas Christian Fellowship.  Pray worked with these prestigious

20  institutions to leverage Pray's data analytics and publish whitepapers on the topics

21  of religion and human flourishing exclusively for Pray's products, such as Pray

22  Health.

23      73.    The professors and studies were peer-reviewed, independent, and

24  sought an objective look at whether or not something like Pray Health would work.

25      74.    The studies were very detailed, not only focusing on the niche Christian

26  market, but also looking at specific subsets of that niche market, such as impact on

27  specific racial groups.  Pray was able to commission these studies because of Pray's

28  market analytics, which informed the research studies.  The data which comprised

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

the studies was extremely detailed and focused on a multitude of customer traits, including demographics, spending habits, and customer acquisition and retention trends, as well as customer geographic location.

75.     While the peer-reviewed studies eventually became public, not all of data underlying these studies was similarly disseminated.  For example, the unique customer data analytics, worth millions of dollars, has never been made public.  Nor have additional confidential learnings from the studies.

76.     Additionally, the peer-reviewed studies informed specific confidential, proprietary components of the Pray Health product, including its user interface and user experience designs, wire frames showing the visual appearance of portions of the software, product specifications, content development process materials, design materials, and financial research/projections.

### 3.     Pray Health Product's Structure and Design.

77.     The structure and design of Pray Health was guided by data collected on Pray's unique customer base and the peer-reviewed studies.  Pray Health was designed and structured based on the preferences and needs of Pray's own unique clients, insights that are valuable to the larger faith-based community.

78.     Pray also created a product development roadmap for Pray Health.  The product development roadmap showed how to properly sequence the introduction of various mental-health wellness tools to consumers to make sure they are effective. Pray had learned through its years of experience in this niche market that offering a full suite of services up front was not effective in attracting customers.  Rather, their data analytics and experience was that product offerings must be properly sequenced in order to effectively attract interest, convert interest into a sale, retain customers, and proliferate the services in which they are interested.

79.     This sequencing was grounded in Pray's customer data and analytics, and knowing how this data was developed by what is referred to as "A/B testing." This takes time and money.  Pray did that work.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

80.    The Pray Health product development roadmap illustrated this unique and specific sequencing, which is effective in the niche Christian marketplace.

81.    In addition, Pray Health was structured and designed in a unique manner to ensure HIPAA compliance.

### 4.    Unique Content Created for Pray Health.

82.    Pray's proprietary data also indicates what content will be effective for this niche market.  Based on this data Pray has developed a proprietary content development playbook.  Based on its proprietary playbook, Pray and its hired contractors drafted unique content for users of Pray Health, including print, audio and video media.

### E.    <u>Pray Protects All Its Confidential Information and Trade Secrets, Including Those Related to Pray Health</u>.

83.    Pray went to great lengths to protect its confidential information and trade secrets related to Pray Health.  As a result of substantial investments and innovation, significant aspects of Pray Health are highly confidential and maintained in strict confidence as trade secrets to protect the substantial investment Pray made to develop them.  This confidential information derives considerable value from not being publicly known outside of Pray, due to the competitive advantage conferred on Pray by the secret nature of the information, from both a technological and business perspective.

84.    Pray uses technological privacy protections to maintain the secrecy of its confidential information and trade secrets related to Pray Health, including using a commercial cloud-services provider with robust security features.  Any access to this proprietary information requires authorization and is encrypted to prevent eavesdropping and interception.

85.    Moreover, access to any specific files or information related to Pray Health is limited according to the roles and responsibilities appropriate for a given user.  Information stored on Pray's cloud services account is not available to all Pray

Miller Baronness, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

employees.  Rather, individual employees must be expressly and individually granted access to specific files and information only as necessary for them to carry out their job duties.

86.    Pray also uses contractual agreements to protect its confidential information and trade secrets.  Each Pray employee signs multiple confidentiality agreements, including an Information Restriction Agreement and an Employee Invention Assignment and Confidentiality Agreement.  These agreements require Pray employees to keep company information in strict confidence and trust:

> At all times, both during my employment and after its termination, and to the fullest extent permitted by law, I will keep and hold all Proprietary Information in strict confidence and trust.

87.    Pray also protects its confidential information and trade secrets that are shared with third parties.  Pray's management sometimes determines that it is in Pray's business interest to share confidential business information with prospective investors, customers, or commercial partners.  Prior to sharing any confidential information with a third party, however, Pray requires strict confidentiality from the third party.  This is sometimes in the form of a non-disclosure agreement.  Pray further requires that third parties receiving Pray's confidential information only use that information for the business purpose that led to the information being shared.

88.    When Pray prepares documents containing confidential information, it places a distinctive marking on the bottom of the document, indicating that the information contained within is confidential and should not be distributed:

**PRAY**  Pray.com - Highly confidential - Not for distribution

### F.    CCM is Not a Tech Company Like Pray.

89.    Unlike Pray, CCM does not specialize in software development, mobile/online program development, or video, audio, and print production.  Instead, CCM facilitates the sharing of medical costs among Christians who pay into their

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600  Los Angeles, California 90067
Tel: (310) 552-4400  Fax: (310) 552-8400

1  ministry, and coordinates the direct sharing of medical expenses among members.

2  That's it.

### G. CCM Told Pray that CCM Would Never Be Able to Build a Product Like Pray Health on Its Own Because of CCM's Lack of Technical Expertise.

90.  In late 2021, Pray and CCM interacted for the first time to explore possible mutually beneficial business opportunities, including CCM's potential investment in Pray.

91.  All of the discussions were led on CCM's side by Harvath and Silvera. At first, Harvath was CCM's Chief Operating Officer, but later was elevated to Chief Executive Officer.  Silvera was CCM's Vice President of Communications & Government Affairs.

92.  At the start, Pray required CCM to sign a confidentiality agreement. Pray does this when discussing its business with third parties.  Once signed, Pray began sharing confidential information about its products regarding  the Pray.com platform.  As part of that exchange, Pray shared its new confidential product in development, Pray Health.

93.  Pray shared with CCM, Harvath and Silvera the Pray Health confidential information and trade secrets described in detail above at Paragraphs 66-82.

94.  CCM, Harvath and Silvera loved Pray Health.  CCM, Harvath and Silvera said to Pray that CCM had never thought of doing something like Pray Health before and that it was much needed in the niche Christian market.

95.  CCM loved Pray Health so much that CCM's Chief Financial Officer, Mark Joos, asked Pray-co-founder Lynn in March 2022 about providing CCM with a right of first refusal for Pray Health.

96.  CCM, Harvath and Silvera also expressed to Pray that CCM would never be able to build a product like Pray Health on its own because of CCM's

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

shortcomings in software development, mobile/online program development, and video, audio, and print production. CCM, Harvath and Silvera told Pray that CCM lacked the technical expertise to build a product like Pray Health. CCM, Harvath and Silvera further expressed to Pray that CCM would not be able to make something like Pray Health commercially viable and HIPAA compliant.

97.     CCM, Harvath and Silvera shared examples of their own technological shortcomings. For example, CCM, Harvath and Silvera told Pray that CCM's own IT department struggled for several years to develop a system to prevent its mass-mailer e-mails from going into its members' spam folders. CCM's technical team struggled with basic things like this, and CCM, Harvath and Silvera told Pray they could never build a product like Pray Health.

**H.    CCM, Harvath and Silvera Used Pray's Trade Secrets to Decide Whether to Build Its Own Product.**

98.     After seeing the confidential information and trade secrets described above at Paragraphs 66-82, CCM, Harvath and Silvera conveyed to Pray that seeing this made CCM, Harvath and Silvera believe for the first time that a product like Pray Health was commercially viable. It also made CCM, Harvath and Silvera believe that Pray Health was a business in which they wanted to participate and which deserved their support.

99.     Eventually, after making these assessments, CCM, Harvath and Silvera decided to launch Pray Health without Pray. By doing this, CCM, Harvath and Silvera improperly used Pray's trade secrets. Instead of using Pray's confidential information solely for the purposes of helping Pray launch the Pray Health product, they used that information (1) to make their own decision about whether or not to proceed with a competing business; and (2) to decide how best to go about proceeding, should they decide to do so. Each of these is an independently actionable use of Pray's trade secrets.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

100.   Regardless of whether CCM's product is launched, reliance on Pray's confidential information and trade secrets to evaluate the viability of such a business, and decide whether or not to pursue such a business, is itself a use of trade secrets under the DTSA and a violation of the SMSA.

101.   Further, under the DTSA, any exploitation of a trade secret that is likely to result in injury to the owner (Pray) or enrichment to the improper user (CCM, Harvath and Silvera) constitutes use of the trade secret.  Marketing goods that embody the trade secret, employing the trade secret in production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret, all constitute use. Even relying on trade secrets to make a decision as to whether or not to proceed with a business is "use" under applicable law.

102.   CCM, Harvath and Silvera did these things when they decided to steal Pray's Pray Health product, after realizing it was viable by obtaining Pray's trade secrets.

**I.   <u>Pray and CCM Entered Into the Strategic Marketing and Support Agreement, dated May 6, 2022</u>.**

103.   As a result of CCM, Harvath and Silvera's representations that it would be a good-faith partner with Pray, Pray and CCM entered into the SMSA.  The SMSA is at issue in this action, and is the contract CCM breached.

104.   CCM's responsibilities under the SMSA include:

(a)   "CCM will recommend and/or facilitate distribution of the Pray.com products to the members of Medi-Share and its other programs."  (SMSA ¶ 1(a).)

(b)   "CCM will have the opportunity to appoint up to two advisors from CCM to the Pray Spiritual Advisory Council (PSAC) described in Section 2(b), as well as have the ability to recommend additional members outside of CCM."  (SMSA ¶

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

1    1(b).)

2    (c)    "Pray Health: **CCM will support Pray.com in building out the**

3            **Pray Health brand."** (SMSA ¶ 1(c), emphasis added.)

4    (d)    "Lease of Office Space: CCM and Pray will work together on an

5            opportunity for Pray to use office space provide by CCM."

6            (SMSA ¶ 1(d).)

7    105.    Pray.com responsibilities in the SMSA include:

8    (a)    "Pray.com will recommend and/or facilitate distribution of Medi-

9            Share and other CCM programs to subscribers of and visitors to

10            the Pray.com web properties." (SMSA ¶ 2(a).)

11    (b)    "Pray.com will create a Pray Spiritual Advisory Council (PSAC)

12            which will be comprised of executive leaders that are strong

13            Christians with a track record of success in their industry.  This

14            council will help with corporate culture, industry research,

15            product development, and marketing activities from a Christian

16            worldview." (SMSA ¶ 2(b).)

17    (c)    "Pray.com will discuss in good faith ways to engage CCM in its

18            development of the Pray Health brand.  In furtherance of the

19            foregoing, Pray.com will reserve to CCM a 30 day right of first

20            refusal on product lines offered under the 'Pray Health' brand

21            name; it being understood that Pray.com may hold an open

22            bidding process to solicit proposals from third parties for such

23            product lines, and CCM will then have 30 days to provide

24            matching or more competitive proposals once they are presented

25            to CCM from Pray.com.  Thereafter, Pray.com may choose the

26            offer that it deems in good faith to be the most favorable to

27            Pray.com." (SMSA ¶ 2(c).)

28    (d)    The SMSA also requires Pray to share financial information with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

21

CCM for as long as CCM holds a financial interest in Pray.
(SMSA ¶ 2(d).)

106.   The SMSA also had a confidentiality provision, which defined
"Confidential Information" to mean "nonpublic information about the disclosing
Party's (or third parties') business or activities that is proprietary and confidential,
which will include all business, financial, technical and other information of a Party
marked or designated by such Party as 'confidential' or 'proprietary;' or information
which, if disclosed orally, is identified as confidential at or prior to disclosure."
(SMSA ¶ 4(a).)

107.   The SMSA says that each party agrees "(a) that it will not disclose to
any third party any Confidential Information disclosed to it by the other except as
expressly permitted in this Agreement and (b) that it will take all reasonable
measures to maintain confidentiality of all Confidential Information of the other
Party in its possession or control, which will in no event be less than the measures it
uses to maintain the confidentiality of its own information or similar important."
(SMSA ¶ 4(b).)

108.   "Subject to each Party's ownership of its pre-existing IP and any
improvements or derivatives thereto . . . Each Party grants the other Party a
nonexclusive, royalty-free license to use any of its own Work Product and
Background IP solely in connection with the provision of services as contemplated
herein or in any Definitive Agreement."

109.   Pray and CCM also agreed that the SMSA was governed by California
law and included a California forum selection clause.  "This Agreement shall be
governed by and construed in accordance with the laws of the State of California
without regard to its conflict-of-law rules.  Any dispute arising hereunder shall be
resolved within the state and federal courts located in the State of California."
(SMSA ¶ 11(c).)

Miller Barondess, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**J.    CCM Instilled Trust by Investing $1.5 Million in Pray.com.**

110.    At the same time the SMSA was executed, CCM also invested $1.5 million into Pray.com.  CCM intended, and Pray understood, this as a commitment on CCM's part.  CCM made this investment to gain Pray's trust, create good will, and ultimately obtain Pray's confidential information and trade secrets related to Pray Health.

111.    CCM's investment further induced Pray to continue working with CCM, including to continue sharing the confidential information and trade secrets described above at Paragraphs 66-82 openly with CCM, Harvath and Silvera.

**K.    The Initial One-Year Term of the SMSA was Extended by Pray and CCM's Multiple "Definitive Agreements."**

112.    To extend the initial one-year term of the SMSA, just one "Definitive Agreement" is required.  Pray and CCM entered into seven.

113.    The SMSA provides that "[t]he Parties shall use good faith efforts to negotiate to enter into future binding agreements with detailed and definitive terms of the responsibilities outlined in Sections 1 and 2 . . . above (the 'Definitive Agreements') as soon as reasonably practicable following the Effective Date." (SMSA ¶ 2.)

114.    The SMSA also provides: "[i]f the Parties do not mutually agree and enter into any such Definitive Agreements during the initial 1-year term of this Agreement, [the SMSA] shall automatically terminate and neither Party shall be obligated to perform any responsibilities set forth in Sections 1 and 2."[2]  (SMSA ¶ 2.)

---

[2] The SMSA shall "automatically renew for successive one-year renewal terms . . . unless either Party elects to terminate the Agreement by giving the other Party written notice at least forty-five (45) days prior to the end of the then-current term." (SMSA ¶ 3.)  Pray and CCM have never given written notice of termination of the SMSA.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

115.    Pray and CCM entered into seven Definitive Agreements with full knowledge and intent that they were "Definitive Agreements" as defined under Paragraph 2 of the SMSA.

### 1.    Definitive Agreement No. 1—The Master Subscription Agreement.

116.    Pray and CCM entered into the Master Subscription Agreement on April 17, 2023.  This is before the SMSA's initial one-year term expired.  The Master Subscription Agreement was signed on behalf of CCM by Mark Joos, CCM's Chief Financial Officer.

117.    Pray and CCM's intent and purpose behind the Master Subscription Agreement was to carry out CCM's responsibility in Paragraph 1(a) of the SMSA, which reads: "CCM will recommend and/or facilitate distribution of the Pray.com products to the members of Medi-Share and its other programs."

118.    The Master Subscription Agreement is how CCM bought bulk subscriptions to Pray.com for CCM's members.  This contract directly carries out the purpose of Paragraph 1(a) of the SMSA.  Thus, this is a Definitive Agreement under Paragraph 2 of the SMSA and extends the initial 1-year term of the SMSA.

### 2.    Definitive Agreement Nos. 2, 3, 4—Insertion Orders.

119.    On June 30, 2022, August 19, 2022, and October 3, 2022, Pray and CCM entered into three separate Insertion Orders.  These were all before the SMSA's initial one-year term expired.  The three Insertion Orders were signed on behalf of CCM by Mark Joos, CCM's Chief Financial Officer.

120.    The Insertion Orders were contracts intended by Pray and CCM to carry out Pray's responsibility in Paragraph 2(a) of the SMSA, which reads: "Pray.com will recommend and/or facilitate distribution of Medi-Share and other CCM programs to subscribers of and visitors to the Pray.com web properties."

121.    The three Insertion Orders governed the placement of CCM advertising on Pray.com platforms.  These contracts directly carry out the purpose of Paragraph

FIRST AMENDED COMPLAINT

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

2(a) of the SMSA; thus, these three Insertion Orders are Definitive Agreements under Paragraph 2 of the SMSA and extend the initial one-year term of the SMSA.

### 3. Definitive Agreement Nos. 5, 6, and 7—Master Services Agreement, Statement of Work and Purchase Order.

122.   Pray and CCM entered into a Master Services Agreement on May 12, 2023.  Silvera signed the Master Services Agreement on behalf of CCM.  Pray and CCM also entered into a Statement of Work, dated August 15, 2023.  Harvath signed the Statement of Work on behalf of CCM.  CCM also signed a Purchase Order on August 16, 2023, which was signed by Harvath on behalf of CCM.

123.   Pray and CCM's purpose and intent behind the Master Services Agreement, Statement of Work and Purchase Order was for Pray to provide CCM with leads to Pray customers that might be interested in becoming CCM members. Pray and CCM intended for these contracts to carry out Pray's responsibility in Paragraph 2(a) of the SMSA, which reads: "Pray.com will recommend and/or facilitate distribution of Medi-Share and other CCM programs to subscribers of and visitors to the Pray.com web properties."

124.   The Master Services Agreement, Statement of Work, and Purchase Order all govern Pray's provision of leads from Pray.com to CCM.  These contracts directly carry out the purpose of Paragraph 2(a) of the SMSA.  The Master Services Agreement, Statement of Work and Purchase Order were intended by Pray and CCM to be Definitive Agreements under Paragraph 2 of the SMSA.

125.   Even though the Master Services Agreement, Statement of Work and Purchase Order were signed after the initial one-year term of the SMSA, they demonstrate Pray and CCM taking actions to carry out the terms of the SMSA beyond the initial one-year term, demonstrating that CCM and Pray believed that the SMSA was in full force and effect even after its initial one-year term.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

### 4.    The Parties' Oral Agreements and Course of Conduct Confirmed Extension of the SMSA's Initial Term.

126.    In addition to signing the Definitive Agreements described above, Pray and CCM also orally agreed that the Definitive Agreements extended the term of the SMSA beyond the initial one-year term.  Pray and CCM acknowledged the existence of the Definitive Agreements.  Neither Pray nor CCM ever said there were no Definitive Agreements.  Neither Pray nor CCM ever said the SMSA had terminated.

127.    The Parties' other actions after the initial one-year term of the SMSA also support that the SMSA was extended.  Pray and CCM understood and intended that the SMSA was extended.  For instance, after the initial one-year term, Pray offered Harvath advisory shares, which would grant him a seat on its Pray Spiritual Advisory Council as contemplated in Paragraphs 1(b) and 2(b) of the SMSA.  Pray had also appointed two other Christian business leaders to the Pray Spiritual Advisory Council, whose purpose was to work on Pray Health.

128.    Pray also continued to meet with CCM, Harvath and Silvera to share confidential information and trade secrets related to Pray Health, even after the one-year mark following execution of the SMSA.  This demonstrates the Parties intended, believed, and acted as though the SMSA were in full force and effect.

### L.    Pray Transferred Confidential Information and Trade Secrets Regarding Pray Health to CCM, Harvath and Silvera.

129.    With the SMSA in place, Pray and CCM increased their rate of interactions with each other in furtherance of the relationship.

130.    During the course of these interactions, Pray shared its confidential information and trade secrets about Pray Health with CCM, Harvath and Silvera, including the marketing strategy based on Pray's unique customer data analytics, peer-reviewed studies, Pray Health's structure and design, and unique content for users of Pray Health, as described in detail above at Paragraphs 66-82.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

131.   This confidential information and trade secrets were communicated in writing and were marked as "Highly Confidential."  While going over the concepts in the written documents, the Parties also spoke about them orally and made clear their understanding that these oral discussions were also highly confidential.  Thus, the confidentiality provision of the SMSA (¶ 4) was triggered.

132.   On June 13, 2022, Silvera, on behalf of CCM, and Potter, on behalf of Pray, had dinner together in Anaheim, California.  Before this dinner, a Pray employee, Elsita Sanya, e-mailed Silvera saying that Silvera and Potter would discuss substantive things about Pray Health, including "Who would be the right person to brainstorm ideas around building out the PRAY Health brand and engaging CCM into the product and services we'll start selling under these efforts?"  At the dinner, Silvera and Potter discussed this as well as other confidential information and trade secrets related to Pray Health, including those described above at Paragraphs 66-82.

133.   On behalf of CCM, Silvera and Harvath also travelled to California in August 2022, September 2022, and April 2023, to have in-person meetings with Pray to discuss in more detail the Pray-Health-specific confidential information and trade secrets described in Paragraphs 66-82, above.

134.   Pray felt comfortable having these confidential discussions with CCM, Harvath, and Silvera because of the trust they had purposely instilled in Pray in order to obtain confidential information and trade secrets about Pray Health, in addition to the SMSA Agreement which assured that CCM would be using the material only to support Pray.  (SMSA ¶ 1(c).)

135.   On April 24, 2023, before going to California, Silvera sent the following group text message to Pray, including to Gatena and Potter, to cement that trust and induce Pray to share confidential information and trade secrets with CCM, Harvath and Silvera: "Brandon and I are back in LA this week (Wednesday and Thursday) and I am flexible Thursday, would you like to get together to draft a pray

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

health plan including proof of concept and MVP?"  On April 26, 2023, Silvera texted the same group: "What does your schedule look like tomorrow afternoon?" and "We are flexible on location and time after 1pm."

136.   Silvera also texted Potter individually, outside of the Pray group chat: "That's why I was asking about time to meet tomorrow on the group chat." Silvera continued: **"Was hoping we can get together to get a business plan for pray health MVP formalized."** (emphasis added).  Potter responded: "Awesome! Tomorrow I can meet up I know Steve just sent to the group chat to meet in the afternoon."  Silvera was directing his actions at California to set up this in-person meeting about Pray Health on April 27, 2023.

137.   During the course of the in-person meeting on April 27, 2023, Pray shared PowerPoint decks regarding Pray Health, which were shown and discussed orally.  These PowerPoint decks were marked "Highly Confidential" and the parties understood that the discussions about the printed materials were also highly confidential.  The PowerPoint decks contained confidential information and trade secrets described above at Paragraphs 66-82.  Both Harvath and Silvera made repeated affirmative comments of excitement and support of Pray Health at the meeting.

138.   A few months later, Silvera e-mailed Lynn, Beck and Gatena to say he was available at 4:00 pm EST on July 11, 2023, or at 3:00 pm EST on July 12, 2023, to have a call to discuss the roadmap for Pray Health (with expected timelines).  The subject line of the e-mail chain scheduling this meeting was called "Pray Health Deck Update."  Silvera knew that Lynn, Beck and Gatena would be in California during this call, and Lynn, Beck, and Gatena were, in fact, in California during the call.  During the subsequent Zoom meeting, the Pray-Health-specific confidential information and trade secrets described in Paragraphs 66-82, above, were discussed.

139.   Next, on July 28, 2023, Silvera wrote in a group text message with Potter and Gatena the following: "Have a great Board Meeting."  In response,

Miller Barondess, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Gatena wrote back "The board is fully supportive of moving forward with Pray Health." Silvera "loved" Gatena's text message, and wrote "That's awesome news!" and "I can't tell you how exciting this is."

140. Silvera then texted the group the following: "People's lives will change for the better because of the work we will do to bring this to market." Lynn and Potter both "loved" this text message. Silvera then wrote "Love you guys… the Lord has appointed this time and this team to make an impact on His people."

141. On July 30, 2023, Silvera e-mailed Gatena, Potter, Lynn, and Beck to discuss the "Pray Health Feature Set." A feature set is the list of features the product Pray Health was going to have when completed, in terms of how Pray designed and intended the product to be. The specific feature set was based on the marketing strategy stemming from Pray's unique customer data analytics, peer-reviewed studies, Pray Health's structure and design, and unique content for users of Pray Health, as described in detail above at Paragraphs 66-82.

142. Silvera wrote to Gatena in the same e-mail: "[j]ust wanted to review the initial 'launch' feature set for Pray Health." Silvera continued: "Can you send the latest feature set list? I want to make sure we are all on the same page, as we have had some different conversations over the past week or so." Then Silvera closed the e-mail: "Looking forward to going over the timelines necessary to develop certain features. We have an opportunity to bring an [sic] special and impactful app into the marketplace."

143. In response, Gatena provided the intended Pray Health feature set and Silvera replied: "Agreed!"

144. During the course of all of these interactions identified above, Pray shared its confidential information and trade secrets about Pray Health with Harvath and Silvera, on behalf of CCM, including the marketing strategy based on Pray's unique customer data analytics, peer-reviewed studies, Pray Health's structure and

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

29

design, and unique user content created for Pray Health, as described in detail above at Paragraphs 66-82.

**M.** **CCM CEO Harvath Demands a Board Seat and Cut-Rate Equity an Pray Health.**

145. By August 2023, Harvath had been serving as CCM's Chief Executive Officer for about five months. Harvath requested a meeting with Pray's management team to give a presentation about Pray and CCM's business dealings to the rest of the CCM management team. The presentation was scheduled for late August 2023.

146. In the meantime, Pray kept performing under the SMSA. On August 14, 2023, Lynn shared a document with Silvera called "Pray Inc. CCM – Pray.com Subscription Services – Pray Health Addendum 8-14-23." The purpose of this agreement was to facilitate CCM's purchase of Pray Health subscriptions for CCM's members. Curiously, CCM, Harvath and Silvera dragged their feet and never signed.

147. By this time, CCM, Harvath and Silvera had already determined they could create the Pray Health faith-based mental health solution without Pray. Leading up to this meeting, Harvath wrote to Potter on August 21, 2023, about Pray's draft presentation for the meeting: "You guys have to sharpen up the 'what's in it for me' part. Bottom line on all of this – co-developing and building is one thing, but making it clear how it helps CCM is something else. We can't just be a sponsor buying air time and ad placement. Otherwise pray is just another 'channel' to us."

148. The meeting went forward in late August 2023. As part of the meeting, Pray showed a PowerPoint deck with sections about Pray Health, which included aspects of the confidential information and trade secrets described in detail in Paragraphs 66-82, above.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

149.   Specifically, page 10 of the PowerPoint deck discusses three "proprietary growth strategies" including Pray Health.  Page 10 disclosed Pray Health's user interface and user experience designs, as well as aspects of the wire frames showing the visual appearance of portions of the software.  All of this was part of the marketing strategy and product structure/design based on customer data analytics-informed, specific, confidential components of the Pray Health product, as alleged in Paragraphs 66-70, 77-81, above.

150.   Further pages 15 and 16 of the PowerPoint deck describe portions of the Pray Health feature set that would be included in Pray Health, based on its customer data analytics targeting the niche Christian market.  All of this was part of the marketing strategy and product structure/design based on customer data analytics-informed, specific, confidential components of the Pray Health product, as alleged in Paragraphs 66-70, 77-81, above.

151.   The entire PowerPoint deck, including these pages, was marked "Highly Confidential – Not for distribution."  The participants at the meeting, from both Pray and CCM, knew that the printed materials, and oral discussions about the printed materials, were highly confidential.

152.   After Pray finished its presentation, Harvath ended the meeting by demanding that Pray give Harvath a seat on its board of directors and the right for CCM to purchase equity in Pray at a below-market price.  This had not been discussed prior to the meeting.  Pray's management did not respond to CCM's demand at the meeting.

**N.**   **Once CCM, Harvath and Silvera Had Obtained Enough Pray Health Confidential Information and Trade Secrets, They Stopped Communicating with Pray.**

153.   Pray's management was surprised by Harvath's demands during the August 2023 meeting.  The demands came out of the blue.

154.   Within a few days of the meeting, Pray responded to CCM's demand.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Pray's management explained to CCM that Pray was not in a position to offer Harvath a board seat with Pray unless CCM made a substantial additional investment in Pray, *i.e.*, over $10 million.  When Harvath learned that Pray would not acquiesce to his demand, he was upset.

155.   But CCM had no intention of actually discussing the matter further or making an additional investment in Pray.  On September 4, 2023, Lynn wrote to the group chat which included Silvera: "Evelio. Are we supposed to have an investment meeting tomorrow with CCM?  I thought that is what we agreed to have but we did not receive a cal[endar] invite."  Silvera responded: "I'm not sure we can meet tomorrow.  Need to confirm in the morning, may have to Re-schedule."

156.   Over the next few weeks, CCM tried to reschedule the meeting with Pray.  But the meeting never happened.  CCM stopped communicating with Pray altogether.

157.   This was confusing to Pray because Harvath had recently told Pray that Pray Health was an urgent project.  As a result, Pray mobilized the team and got ready to move quickly.  But then CCM, Harvath and Silvera stopped engaging with Pray altogether.

**O.**   **CCM, Harvath and Silvera Used Pray's Trade Secrets, and Announced Their Stolen Product to Thousands of People at an Industry Conference.**

158.   In September 2023, Pray realized why CCM had stopped engaging.  That month, AACC was hosting its annual Know Hope World Conference at a hotel in Nashville, Tennessee.

159.   Pray co-founder Matthew Potter attended the conference.  During the conference, Potter met with the CEO of AACC, Ben Allison.  Potter and Allison had a long-time relationship, which predated CCM's relationship with AACC.  During the meeting, Potter told Allison about Pray Health (in generalities).  To Potter's surprise, Allison suggested Potter speak to CCM, Harvath and Silvera because he

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

said they were working on a new, cutting-edge faith-based mental health solution

too. These people working on the product were the same people Pray had been

working with for over a year and a half, sharing substantial confidential information

and trade secrets about Pray Health.

160. Allison then showed Potter a demo of CCM's faith-based mental health

solution. It was on a secure, private website, which required a password. Once

Allison logged in, Potter saw a demo for CCM's mental health product. Potter, who

had been intimately involved in the development of Pray Health and attended many

meetings with Harvath and Silvera, on behalf of CCM, knew right away that CCM,

Harvath and Silvera had stolen Pray's confidential information and trade secrets

described above in Paragraphs 66-82 to develop the demo. The demo was obviously

influenced and inspired by Pray Health because it was so similar to Pray Health.[3]

161. Potter recognized in the demo key Pray Health trade secrets which had

been communicated to CCM, Harvath and Silvera in confidential documents and

communications several times during the prior year and a half. For example, the

demo showed that CCM's product included features from Pray Health's feature set,

as shown on pages 15 and 16 of the PowerPoint deck, which had been shown to

CCM, Harvath and Silvera most recently just weeks before in the confidential

meeting between Pray and CCM in late August 2023.

162. This confidential information and trade secrets had been communicated

from Pray to CCM, Harvath and Silvera all along, from 2022 through August 2023.

CCM had stolen Pray's product.

163. Potter also recognized that it would have taken CCM and AACC a very

long time to develop this product on their own, if they could have done it at all.

[3] Pray sought more information and documents regarding CCM's competing product
by serving requests for production on CCM on February 16, 2024. To date, CCM
has not produced any documents related to its competing product, despite the
Court's instructions at the Rule 16 conference to proceed with discovery.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600    LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

164.   Allison also told Potter that CCM's product was going to be available in all 50 states, including California, just as was the plan for Pray Health.

165.    Importantly, the demo that Potter viewed required knowledge of materials and concepts that CCM had explicitly told Pray that it did not have the competence, knowledge or expertise to accomplish before being exposed to the Pray Health confidential information and trade secrets.  Indeed, CCM told Pray that it decided to go into this business with Pray only after reviewing the Pray Health trade secrets and determining, based on those materials, that the business would be successful.

166.   By doing this, CCM, Harvath and Silvera improperly used and disclosed Pray's trade secrets. Instead of using Pray's confidential information and trade secrets solely for the purposes of helping Pray launch the Pray Health product, they used that information (1) to make their own decision about whether or not to proceed with a competing business; (2) to decide how best to go about proceeding, should they decide to do so; and (3) to develop a product that would compete with Pray Health and disclosed the Pray Health trade secrets to AACC.

167.   Under the DTSA, each of these items is an independently actionable use of Pray's trade secrets.  CCM, Harvath and Silvera have benefited and will continue to benefit from their use of Pray's trade secrets as they develop their product which competes with Pray Health.

168.   Relying on Pray's confidential information and trade secrets to evaluate the viability of such a business, and whether or not to pursue such a business, is itself a use of trade secrets under the DTSA.

169.   Further, under the DTSA, exploitation of a trade secret that is likely to result in injury to the owner (Pray) or enrichment to the improper user (CCM, Harvath, and Silvera) constitutes use of the trade secret.  Marketing goods that embody the trade secret, employing the trade secret in production, relying on the trade secret to assist or accelerate research or development, or soliciting customers

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  through the use of information that is a trade secret all constitute use. Even relying

2  on trade secrets to make a decision as to whether or not to proceed with a business is

3  "use" under applicable law. CCM, Harvath and Silvera did these things when they

4  decided to steal Pray's Pray Health product, after realizing it was viable by way of

5  seeing Pray's trade secrets.

6      170.   Moreover, CCM, Harvath and Silvera improperly acquired the Pray

7  Health trade secrets. CCM, Harvath and Silvera were intentionally concealing the

8  fact that they were (at some point when the applicable agreements were in force)

9  secretly working with AACC to develop and launch their own copy-cat mental

10  health product without Pray. After this point in time, CCM, Harvath and Silvera's

11  acquisition of the Pray Health trade secrets from Pray was improper because CCM,

12  Harvath and Silvera—when they acquired the trade secrets—intended to use them in

13  violation of the SMSA to develop and launch their own faith-based mental health

14  solution with AACC.

15      171.   Given his deep involvement in the development of the Pray Health

16  trade secrets, described above in Paragraphs 66-82, his presence at most of the

17  meetings with CCM, Harvath and Silvera where the Pray Health trade secrets were

18  discussed, and his extensive experience in the technology and app development

19  industry, Potter knew it would have been impossible for CCM, Harvath and Silvera

20  to develop the CCM demo independently without the use of Pray's confidential

21  information and trade secrets related to Pray Health. Moreover, CCM had

22  assured—both explicitly in word and deed through its contracts—that it was

23  pursuing Pray Health with Pray and no one else. Therefore, there is no way other

24  than by use of Pray's trade secrets that CCM could have accomplished what Potter

25  saw in CCM's demo. For all these reasons, Potter's intuition that the confidential

26  information and trade secrets had been stolen was accurate.

27      172.   The same day, Potter attended a keynote address at the conference.

28  During the keynote address, Harvath announced that CCM was partnering with

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

AACC to create a brand-new faith-based mental health solution, *i.e.*, the demo he had first seen just hours earlier.

173.    During the presentation, Harvath said: "Today Tim [Clinton] and I are excited to announce that we are locking arm in arm as two incredible world class organizations—the AACC and Christian Care Ministry—in creating the world's first faith-based mental health and wellness solution.  Friends, this is a historic moment."  This was a lie.  CCM, Harvath and Silvera knew it was a lie.

174.    Harvath continued: "To build the world's first faith-based network of Christian counselors, clinicians, and non-clinicians and to build a ***faith-based mental health solution*** for the Church.  So it was a historic night in so many ways.  No one else is doing this work right now and we couldn't be more excited than to lock arms with a faith-based organization like the AACC to bring these kinds of solutions to the Church."  This was another lie, and CCM, Harvath and Silvera knew it.  Significantly, several of the phrases used by Harvath were copied directly from Pray's confidential PowerPoint deck shared with CCM, Harvath, and Silvera at the meeting in late August 2023 which uses the same language —discussing bringing to market a "***faith-based mental health solution*** PRAY Health" and the fact that Pray Health is the first in the world.

175.    After Harvath's keynote address was over, he sat down with Silvera to film a segment to discuss the announcement.  On camera, both smiling, Harvath and Silvera bragged how CCM's debut product was new, had never been done before, and was revolutionary.  Silvera said emphatically: "It's more than just the logo and the sponsorship.  It's an exciting launching for something truly, truly historic."

176.    A YouTube video covering this announcement was posted by CCM, directed at consumers in all 50 states, including California.  That YouTube video is still available here: https://www.youtube.com/watch?v=tvfSGRitihQ.

177.    The same is true of an article posted on CCM's website, which was available here: https://blog.mychristiancare.org/christian-care-ministry-announces-

partnership-with-aacc. However, after Pray filed its original complaint, CCM removed the content from the website. Like the YouTube video, this article was directed at consumers in all 50 states, including California.

178. Another website CCM post, which was available at https://www.medishare.com/cfn/aacc announced that CCM's faith-based mental health solution would launch in the Spring of 2024 and solicited e-mail addresses from consumers interested in more information. After Pray filed its original complaint, however, CCM removed all mention of its faith-based mental health solution from the website. Here again, the website was directed at and solicited e-mail addresses from consumers in all 50 states, including California.

179. After Harvath's keynote address, Potter ran into both Harvath and Silvera. Both looked visibly uncomfortable to see him when they realized Potter had seen Harvath's announcement.

180. Harvath and Silvera also realized that Potter had seen all of the outside vendors CCM had been working with to spread the word of its copy-cat faith-based mental health solution. Potter had, in fact, seen that many outside vendors and organizations in the Christian business space were there specifically to learn about CCM's faith-based mental health solution.

181. Later the same day, Potter ran into Harvath and Silvera again. During this second interaction, hours later, Harvath tried to recruit Potter by suggesting that he'd be better off working with them at CCM, rather than at Pray. Harvath was trying to mitigate the fact that CCM's secret had been revealed to Potter. Potter, of course, did not entertain Harvath's offer.

182. The circumstantial evidence, moreover, is strong that CCM, Harvath and Silvera stole Pray's confidential information and trade secrets related to Pray Health. For example, CCM partnered with AACC, which originally was Pray's idea and acknowledged a pre-existing relationship. CCM even went so far as to use the same public relations firm Pray was using for Pray Health. Notably, CCM fired both

Miller Barondess, LLP
Attorneys at Law
2121 Avenue of the Stars, Suite 2600  Los Angeles, California 90067
Tel: (310) 552-4400   Fax: (310) 552-8400

1   Harvath and Silvera after Pray's original complaint was filed, which indicates
2   wrongdoing.

3       183.  CCM, Harvath and Silvera concealed their wrongful conduct.  Months
4   earlier, Silvera discouraged Pray from reaching out to AACC, saying that AACC's
5   President Tim Clinton was unethical and forwarding a link to a news story about a
6   lawsuit accusing Clinton of fraud.

7       184.  Only a few months later however, CCM revealed its own collaboration
8   with AACC.  In retrospect, it is obvious what Silvera was doing.  He didn't want
9   anyone from Pray speaking with AACC because Pray would likely learn what CCM
10  was doing and its ongoing theft.

11      185.  As trusted partners under the SMSA, CCM, Harvath and Silvera had
12  front row seats to Pray's confidential and proprietary business strategies and had
13  access to Pray's confidential and proprietary information related to Pray Health.

14      186.  As explained above, CCM, Harvath and Silvera had and continue to
15  have a duty to maintain the confidentiality of Pray's trade secrets and confidential
16  information under the SMSA.  They also collectively had and continue to have an
17  obligation not to disclose or use Pray's trade secret information for purposes beyond
18  the SMSA.  By using the Pray Health confidential and proprietary trade secrets to
19  decide to proceed with its business, and (separately) using that information to
20  develop a competing product to Pray Health (as witnessed in the demo by Potter),
21  CCM breached its contractual obligations in the SMSA, and CCM, Harvath and
22  Silvera misappropriated Pray's trade secrets.

23  ## FIRST CAUSE OF ACTION
24  ### Breach of Contract
25  ### (Against Defendant CCM)

26      187.  Pray incorporates and re-alleges every allegation in Paragraphs 1-186,
27  above, as if fully set forth herein.

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

188.   The SMSA was, and remains, a binding, valid and enforceable contract, with consideration, whose terms had not expired, that Pray and CCM voluntarily entered into.

189.   The SMSA had an initial term of one year, which was extended pursuant to the terms of the SMSA.  Specifically, the SMSA provides that if the parties enter into "Definitive Agreements," as that term is defined under Paragraph 2 of the SMSA, the term would be extended.

190.   Pray and CCM entered into seven Definitive Agreements.  The first was the Master Subscription Agreement dated April 17, 2023.  The second, third, and fourth were three separate Insertion Orders, signed on June 30, 2022, August 19, 2022, and October 3, 2022, respectively.  The fifth, sixth, and seventh were a Master Services Agreement, Statement of Work, and Purchase Order, signed on May 12, 2023, August 15, 2023, and August 16, 2023, respectively.  See Paragraphs 112-128, above, for a detailed description of each Definitive Agreement.

191.   Pray and CCM also orally agreed that the Definitive Agreements above extended the term of the SMSA beyond the initial one-year term.

192.   Pray and CCM's actions also confirm that the SMSA was extended beyond the initial one-year term.  Specifically, after the initial one-year term, Pray offered Harvath advisory shares, which would grant him a seat on Pray's Pray Spiritual Advisory Council, contemplated in Paragraphs 1(b) and 2(b) of the SMSA. Pray had also appointed two other Christian business leaders to the Pray Spiritual Advisory Council, whose purpose was to work on Pray Health.  Also, neither Pray nor CCM ever expressed orally or in writing that the term of the SMSA should or would expire.

193.   Pray performed as promised in the SMSA, and to the utmost extent possible fulfilled each and every term of this contract, except as to any terms that it was prevented or excused from performing.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

194.   CCM materially breached the SMSA in two ways.  First, CCM breached the SMSA's provision which says "CCM will support Pray.com in building out the Pray Health brand."  (SMSA ¶¶ 1(c) and 5.)  Rather than supporting Pray in building out Pray Health, after CCM obtained all of the confidential information and trade secrets regarding Pray Health, as described in Paragraphs 66-82 above, CCM used Pray's trade secrets to build a copy-cat faith-based mental health solution.  CCM stole Pray Health, and all related confidential information and trade secrets.

195.   CCM also announced in front of 7,000 people at an industry conference that it *alone*—i.e., without Pray—would be launching a first-of-its-kind faith-based mental health solution.  In reality, CCM did nothing more than steal Pray Health from Pray.  This breached CCM's duties under Paragraph 1(c) and Paragraph 5 of the SMSA.

196.   The second way CCM materially breached the SMSA was by breaching the confidentiality provision of the SMSA.  (SMSA ¶ 4.)

197.   CCM communicated the confidential information and trade secrets regarding Pray Health to AACC behind Pray's back, which is a violation of Paragraph 4 of the SMSA.  As proven by the demo which Allison showed Potter during the AACC conference in September 2023, CCM relied on, used, stole, and benefitted from the confidential information and trade secrets regarding Pray Health, as described in Paragraphs 66-82 above, and disclosed that confidential information and trade secrets to AACC during the development of the demo.

198.   As a proximate result of CCM's conduct, Pray has suffered damages in an amount subject to proof at trial, but no less than $250 million.  These damages consist of lost profits, as well as loss of business value of Pray Health.  Further, Pray lost all opportunities to obtain funding to launch Pray Health.  All of this is caused by Defendant's wrongdoing.

Miller Baronsess, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good-Faith and Fair Dealing

### (Against Defendant CCM)

199.   Pray incorporates and re-alleges every allegation in Paragraphs 1-186, above, as if fully set forth herein.

200.   The SMSA was a valid and enforceable contract that existed between Pray and CCM.

201.   Pray performed as promised in the SMSA, and to the utmost extent possible fulfilled each and every term of this contract, except as to any terms that it was prevented or excused from performing.

202.   Pray bargained for and received a promise from CCM that CCM would support Pray in launching Pray Health.  This was one of the benefits of the contract for Pray.

203.   To the extent that CCM's actions in developing a product competitive with Pray Health did not violate an explicit term in the SMSA, Pray alleges, in the alternative, that CCM prevented Pray from receiving that benefit of the SMSA by developing a product that would directly compete with Pray Health.

204.   By doing so, CCM engaged in a conscious and deliberate act to frustrate the purpose of the SMSA.  CCM did not act fairly—or in good faith—and in conscious disregard of its duties owed to Pray under the SMSA.

205.   As a proximate result of CCM's conduct, Pray has suffered damages in an amount subject to proof at trial, but no less than $250 million.  These damages consist of lost profits, as well as loss of business value of Pray Health.  Further, Pray lost all opportunities to obtain funding to launch Pray Health.  All of this is caused by Defendant's wrongdoing.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## THIRD CAUSE OF ACTION

### Violation of the Defend Trade Secrets Act (DTSA)

### (18 U.S.C. §§ 1836(b), 1839 *et seq.*)

### (Against All Defendants)

206.    Pray incorporates and re-alleges every allegation in Paragraphs 1-186, above, as if fully set forth herein.

207.    Pray is the owner of certain confidential, valuable trade secrets relating to Pray Health, as previously discussed.  Specifically, this includes the marketing strategy based on Pray's unique customer data analytics; peer-reviewed studies related to Pray Health, including non-public confidential aspects of the studies; Pray Health's structure and design; and unique content for users created for Pray Health, as described in detail above at Paragraphs 66-82.

208.    These trade secrets, which are not publicly disclosed, relate to Pray's products and services used in or intended for use in interstate and foreign commerce. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage to Pray, and Pray has spent a significant amount of time and money developing such confidential information and trade secrets.

209.    At all times, Pray has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality agreements to be signed by Pray's employees and any other party granted access to Pray's trade secrets, as well as using technological means to maintain the secrecy of Pray's trade secrets.

210.    In the course of Pray's commercial relationship with CCM, Pray afforded CCM, Harvath and Silvera limited access to and limited use of Pray's confidential information and trade secrets, which CCM, Harvath and Silvera had a duty to maintain as confidential.  Further, CCM executed the SMSA, where it expressly acknowledged and confirmed the confidential nature of these secrets.

211.    As stated above, Pray sells its solutions throughout the United States.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

The confidential information and trade secrets to which CCM, Harvath and Silvera had access are related to Pray's products and services that are used in, or intended for use in, interstate or foreign commerce.

212.  Harvath, Silvera and other employees of CCM misappropriated Pray's confidential information and trade secrets to benefit themselves and CCM, and to allow CCM to unfairly compete against Pray by using Pray's trade secrets, including in this District.  Misappropriation of this type of information undermines Pray's competitive position in the highly competitive technology solutions and healthcare industries.

213.  Harvath, Silvera and CCM knew or should have known that Pray's trade secrets (a) are confidential; (b) were acquired by a person who knew or had reason to know that the trade secret was acquired by improper means, or were disclosed or used without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to Pray to maintain the secrecy of the trade secret or limit the use of the trade secret; (c) were developed or acquired by Pray at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Pray's competitors; (e) would provide significant benefit to a competitor seeking to compete with Pray; and (f) are critical to Pray's ability to conduct its business successfully.

214.  CCM, Harvath and Silvera improperly acquired the Pray Health trade secrets.  CCM, Harvath and Silvera intentionally concealed the fact that they were (at some point when the applicable agreements were in force) secretly working with AACC to develop and launch their own copy-cat mental health product without

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400  FAX (310) 552-8400

Pray.  After this point in time, CCM, Harvath and Silvera's acquisition of the Pray Health trade secrets from Pray was improper because CCM, Harvath and Silvera—when they acquired the trade secrets—intended to use them in violation of the SMSA to develop and launch their own faith-based mental health solution with AACC.

215.  CCM, Harvath and Silvera improperly used and disclosed Pray's trade secrets when, instead of using Pray's confidential information solely for the purposes of helping Pray launch the Pray Health product, they used that information (1) to make their own decision about whether or not to proceed with a competing business; (2) to decide how best to go about proceeding, should they decide to do so; and (3) to develop a product that would compete with Pray Health and disclosed the Pray Health trade secrets to AACC.

216.  Each of these items is an independently actionable use of Pray's trade secrets.  Defendants have benefited and will continue to benefit from their use of Pray's trade secrets as they develop their product, which competes with Pray Health.

217.  Even if CCM's product is never launched, relying on Pray's confidential information and trade secrets to evaluate the viability of such a business, and whether or not to pursue such a business, is itself a use of trade secrets under the DTSA.

218.  CCM, Harvath and Silvera did this with an intent to deceive Pray, by concealing certain facts, and misrepresenting other facts.  This was designed to induce Pray into continuing to cooperate with CCM, Harvath and Silvera and to share trade secrets with CCM, Harvath and Silvera.

219.  Harvath, Silvera and other CCM employees who misappropriated Pray's trade secrets are agents of CCM, and their misappropriation of Pray's trade secrets occurred, and is occurring, during the course of and within the scope of their employment at CCM.  Their improper actions, including using the trade secrets to make the decision as to whether or not CCM should pursue a competing business,

transferring Pray's confidential and trade secret information to AACC, acquiring the trade secrets after they had already decided to use the trade secrets in violation of the SMSA, and using such information to create a product to compete with Pray Health, were substantially within the temporal and spatial scope of their employment with CCM and were for the purpose of giving CCM an unfair advantage against Pray.

220.   CCM is therefore at least vicariously liable for Harvath, Silvera and other CCM employees' misappropriation of Pray's trade secrets, in addition to being directly liable for its own improper, acquisition, use and disclosure of Pray's trade secrets as alleged herein.

221.   At no time has Pray consented to Harvath, Silvera, or CCM's improper acquisition, disclosure, or use of Pray's trade secrets for any reason unrelated to the purposes of the SMSA.

222.   As a direct and proximate result of Harvath, Silvera, or CCM's  current and continued misappropriation of Pray's trade secrets, Pray has been damaged, including but not limited to the loss of goodwill and profits.  Additionally, CCM has been unjustly enriched, while at the same time Pray has been prevented from launching its Pray Health product.

223.   Defendants have engaged in the actual and threatened misappropriation of Pray's confidential information, including trade secrets, in violation of the DTSA.

224.   The actions of the Defendants were and continue to be intentional, willful, outrageous, and malicious, justifying actual and exemplary damages to the extent permitted under the law.

## FOURTH CAUSE OF ACTION

### Concealment

### (Against All Defendants)

225.   Pray incorporates and re-alleges every allegation in Paragraphs 1-186, above, as if fully set forth herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

226.   Pray and CCM entered into the SMSA, and seven "Definitive Agreements" as that term is defined by the SMSA.  The purpose of these agreements was for Pray and CCM to explore mutually beneficial business opportunities.

227.   As part of the information exchange, Pray told CCM, Harvath and Silvera about Pray Health.  CCM, Harvath and Silvera loved the idea, and expressed that there was no way CCM could ever do something like Pray Health on its own due to CCM's lack of technical expertise.

228.   Throughout the course of their interactions between early 2022 and August 2023, CCM, Harvath and Silvera intentionally kept secret their plan to steal Pray's trade secrets related to Pray Health and launch their own copy-cat faith-based mental health solution.

229.   As Pray kept providing its Pray Health-specific confidential information and trade secrets, CCM, Harvath and Silvera had numerous opportunities to disclose their plan.  But they didn't.

230.   Between early 2022 and August 2023, Pray, on the one hand, and CCM, Harvath and Silvera, on the other hand, engaged in four in-person meetings, 31 Zoom calls, six Google Meet-Up meetings, and one Microsoft Teams meeting. At no time during any of these dozens of interactions did CCM, Harvath or Silvera reveal their plan to launch a competing product.

231.   Additionally, in mid-2023, Silvera actively discouraged Pray from reaching out to AACC.  Silvera told Pray that AACC's President, Tim Clinton, was unethical and forwarded a link to a news story about a lawsuit accusing Clinton of fraud.

232.   Silvera did this, on behalf of CCM, in order to prevent Pray from contacting AACC.  If Pray reached out to AACC, Pray would find out what CCM, Harvath and Silvera were doing.  Silvera's actions were intentionally done to conceal CCM, Harvath and Silvera's secretive business relationship with AACC

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  regarding their copy-cat faith-based mental health solution.  By doing this, Silvera

2  was preventing Pray from discovering what was going on.

3      233.  CCM, Harvath and Silvera were successful in concealing these secrets

4  from Pray.  Pray did not find out what CCM, Harvath and Silvera were doing until

5  Potter met with Allison at the September 2023 conference.  Allison showed Potter

6  the demo of CCM's "new" mental health solution.  But Potter realized right away

7  what had happened.  CCM, Harvath and Silvera had concealed their plan for over a

8  year, despite frequent interactions with Pray.

9      234.  CCM, Harvath and Silvera concealed these relevant facts intentionally,

10  with the goal of deceiving Pray.  CCM, Harvath and Silvera knew that if they

11  appeared to be acting in good faith, Pray would continue to openly share the

12  commercially valuable confidential information and trade secrets regarding Pray

13  Health, including marketing strategy based on Pray's unique customer data

14  analytics, peer-reviewed studies, Pray Health's structure and design, and unique

15  content for users of Pray Health, as described in detail above at Paragraphs 66-82.

16      235.  Had Pray known the truth, Pray would never have openly shared the

17  valuable confidential information and trade secrets with CCM, Harvath and Silvera.

18      236.  As a result, Pray was harmed.  Pray was robbed of being the "first

19  mover" in the small, niche Christian marketplace.  Further, because of the

20  announcement that Harvath made at the September 2023 conference, potential

21  investors in Pray Health dried up.

22      237.  CCM, Harvath and Silvera's concealment was a substantial factor in

23  causing this harm to Pray.

24                    **FIFTH CAUSE OF ACTION**

25                    **Intentional Misrepresentation**

26                    **(Against All Defendants)**

27      238.  Pray incorporates and re-alleges every allegation in Paragraphs 1-186,

28  above, as if fully set forth herein.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

239.   Pray and CCM entered into the SMSA and seven "Definitive Agreements" as that term is defined by the SMSA.  The purpose of these agreements was for Pray and CCM to explore mutually beneficial business opportunities, including Pray Health.

240.   CCM, Harvath and Silvera loved Pray Health.  Further, throughout the Parties' interactions between early 2022 and August 2023, CCM, Harvath and Silvera on many occasions affirmatively stated to Pray that they would be supportive of Pray as it launched the Pray Health faith-based mental health solution.

241.   Specifically, on July 28, 2023, Silvera, on behalf of CCM, wrote in a group text message with Potter and Gatena the following: "Have a great Board Meeting."  In response, Gatena wrote back "The board is fully supportive of moving forward with Pray Health."  Silvera "loved" Gatena's text message, and wrote "That's awesome news!" and "I can't tell you how exciting this is."

242.   Silvera then texted the group, on behalf of CCM, the following: "People's lives will change for the better because of the work we will do to bring this to market."  Lynn and Potter both "loved" this text message.  Silvera then wrote "Love you guys… the Lord has appointed this time and this team to make an impact on His people."

243.   On July 30, 2023, Silvera, again on behalf of CCM, e-mailed Gatena, Potter, Lynn, and Beck to discuss the "Pray Health Feature Set."  A feature set is the list of features the product Pray Health was going to have when completed, in terms of how Pray designed and intended the product to be.  The specific feature set was based on the marketing strategy stemming from Pray's unique customer data analytics, peer-reviewed studies, Pray Health's structure and design, and unique content for users of Pray Health, as described in detail above at Paragraphs 66-82.

244.   Silvera wrote to Gatena in the same e-mail: "[j]ust wanted to review the initial 'launch' feature set for Pray Health."  Silvera continued: "Can you send the latest feature set list?  I want to make sure we are all on the same page, as we have

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

had some different conversations over the past week or so." Then Silvera closed the e-mail: "Looking forward to going over the timelines necessary to develop certain features.  We have an opportunity to bring an [sic] special and impactful app into the marketplace."

245.   In response, Gatena provided the intended Pray Health feature set and Silvera replied: "Agreed!"

246.   These are just two examples, of many, in which CCM and Silvera represented to Pray that facts were true, when in reality these were false statements made with the intent to mislead Pray.  Further, these messages on July 28 and 30, 2023, were so close to the revelation of the CCM product demo in September 2023 that it would have been impossible for these statements to be true.  In other words, CCM, Harvath and Silvera must have been actively working with AACC on the competing product when these July 28 and 30, 2023, messages were sent.

247.   The same is also true of Harvath and Silvera's repeated affirmative comments of excitement and support of Pray Health at the in-person meeting in California on April 27, 2023. This is an example, among many, in which Harvath and Silvera represented to Pray that facts were true, when in reality they were false statements made with the intent to mislead Pray.

248.   CCM, Harvath and Silvera knew their repeated and ongoing representations about supporting Pray Health were false.  CCM, Harvath and Silvera said what they thought Pray wanted to hear with respect to Pray Health.  They kept praising Pray Health.

249.   This was done on purpose, with the intent to deceive Pray.  CCM, Harvath and Silvera intended that Pray would rely on their representations.

250.   CCM, Harvath and Silvera worked hard to gain Pray's trust.  It was a scam.  When Allison showed Potter the demo at the industry conference in Nashville, Potter recognized that it would have taken CCM and AACC a very long time to develop this product on their own, if they could have done it at all.  It was

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

obvious that CCM, Harvath and Silvera were doing this work behind Pray's back, while also making affirmative statements of support and excitement to Pray about Pray Health.  These statements from CCM, Harvath and Silvera to Pray were misleading and false.  CCM, Harvath and Silvera were not excited to support Pray.

251.   Pray reasonably relied on CCM, Harvath and Silvera's misrepresentations.

252.   As a result, Pray was harmed.  Pray was robbed of being the "first mover" in the small, niche Christian marketplace.  Further, because of the announcement that Harvath made at the September 2023 conference, potential investors in Pray Health dried up.

253.   CCM, Harvath and Silvera's misrepresentations were a substantial factor in causing this harm to Pray.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment, as follows:

1.      Compensatory, general, and special damages, including Pray's lost revenues and profits, and any unjust enrichment, restitution, or disgorgement, in excess of $250 million, according to proof at trial;

2.      Punitive damages in an amount to be determined at trial;

3.      Attorneys' fees and costs;

4.      Pre- and post- judgment interest as permitted by law; and

5.      Such other and further relief as the Court deems just and proper.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
2121 AVENUE OF THE STARS, SUITE 2600   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    DATED:  April 19, 2024                MILLER BARONDESS, LLP

2

3

4                                         By: _____

5                                         LOUIS R. MILLER
                                          Attorneys for Plaintiff
6                                         PRAY, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED:  April 19, 2024                    MILLER BARONDESS, LLP


By: _____

LOUIS R. MILLER
Attorneys for Plaintiff
PRAY, INC.